[Nos. 38592, 38629. En Banc. October 26, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. ARTHUR NATHANIEL AIKEN, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. ANTONIO NATHANIEL WHEAT, *Appellant*.*

*Reported in 434 P.2d 10.

*Kempton, Savage & Gossard, Robert S. Egger,* and *Anthony Savage, Jr.,* for appellant Aiken (appointed council for appeal).

*Charles M. Stokes* and *Philip L. Burton,* for appellant Wheat (appointed council for appeal).

*Charles O. Carroll, William L. Kinzel,* and *Jack A. Richey,* for respondent.

*Douglas Shaw Palmer,* amicus curiae.

HUNTER, J.—This is an appeal from the conviction of the defendants (appellants), Antonio N. Wheat and Arthur N. Aiken, on three counts of murder in the first degree, while the defendants were engaged in committing, attempting to commit, or withdrawing from the scene of a robbery. The death penalty was imposed by a special verdict of the jury.

Wheat and Aiken were airmen 3rd class in the United States Air Force, stationed at Paine Field near Everett, Washington, at the time of the commission of the homicides with which they were charged. Both are Negroes and were 20 and 19 years of age, respectively. Wheat is a high school graduate and had worked in Spiegel's Store in Chicago, Illinois, in a supervisory capacity; he had served 2 years in the Air Force, performing the duties of a cook, and had aspirations of becoming a school teacher. Aiken had been in the Air Force for 2 years and through its educational facilities had completed his high school education; in addition, he held one of the degrees of "brown belt" in service judo competition.

The three homicides with which the defendants were charged were the killing of Owen Fair, service station attendant of a Time Oil Service Station in Seattle, on March 26, 1965; the killing of Daniel Wolf, service station attendant of an Enco Service Station in Seattle, on April 12, 1965; and the killing of James Harp, service station attendant of a Douglas Service Station north of Seattle in King County, on April 24, 1965.

Evidence leading to the apprehension of defendant Wheat came from the identification of Wheat's car which had been seen at the Douglas Service Station April 24th at about 4 o'clock in the morning, approximately 15 minutes before the estimated time of Harp's death. Later that day a car matching the description of the vehicle, observed at the Douglas station, was discovered by police officers in a park-

ing lot opposite the main gate of Paine Field. A check with the Snohomish County sheriff's office disclosed it to be Wheat's car.

About 4 o'clock that afternoon Wheat was taken into custody at Paine Field; advised that his automobile had been observed at the scene of a homicide and that he matched the description of a person seen there. He consented to a lineup, where he was identified by witnesses as having been at the Douglas station shortly prior to the homicide. Later that evening Wheat was taken from Paine Field to the King County jail.

Statements taken from Wheat at Paine Field implicated the defendant Aiken, whereupon an all-points bulletin was issued over the police radio, and resulted in Aiken's apprehension on the evening of April 25, 1965, at Blaine, Washington. He was taken into custody by the Border Patrol and transported by the Blaine police to the Whatcom County jail at Bellingham. Later the same evening he was met by officers of the Seattle Police Department and the King County sheriff's office and taken to the King County jail.

To more completely understand the contentions raised on this appeal, as well as the extent of the asserted participation and complicity of the defendants in the alleged homicides, the defendants' respective versions of the robberies and homicides, as appear in their written statements, introduced in evidence, are set forth in substantial detail. Clerical corrections, as they appear, are also inserted as initialed by each defendant.

### The Owen Fair Homicide

In Wheat's statement (state's exhibit 4) taken at 11:08 p.m., on April 25, 1965, with regard to the Time Oil Station robbery and homicide of Owen Fair at about 10:30 p.m. on March 26, 1965, Wheat states:

I have been advised by Detectives E. T. Mullen, and O. C. Church, of the Seattle Police Department, that I do not have to say anything. That I have a right to see an attorney before saying anything, and that anything I do say, could be used against me in a court of law.

. . . I saw Aiken had the man backed into a small storage area. Aiken was pointing his silver colored, .22 caliber automatic at the man. The man was just standing there, with his hands probably held about half way up. Aikens reached over, and pulled a key off the mans belt, that was attached to a string of some sort. Aiken handed me the key, and told me to go check the cash box. I took it, and went into the office. I opened the cash box, on the counter against the wall, with the key. The box was empty, so I returned to lube room, and told Aiken. At that time, Aikens asked the man, where the money was. The man said he had just come back from taking the money somewhere. At that time, Aikens hit the man in the face, with his left hand. The man said, "please, I have heart trouble," and put his hands over his face. When he said this, Aikens kind of clubed the man behind his head, with his left hand, and the man fell on the floor. As the man was laying on the floor, Aikens went through his pockets. He took the mans wallet from his back pocket, and some money from the mans shirt pocket. Aikens then asked the man if he had any more. The man didn't say anything, just laid on the floor. At this time, I went out to the car, to start it, because I had been having trouble getting it started. I was trying to start the car, when I heard about four or five gunshots, from the station. I looked back toward the station, and saw Aikens walk out of the lube, into the office. He stood there for a few seconds, looking around, then he walked on outside, and got into my car. I managed to start the car, and I drove away, . . . . On the way from the station, to Macs Show Place, Aiken divided the money we had got. My share was about thirty eight dollars. . . .

This is a true and voluntary statement, given freely by me, to Detectives E. T. Mullen, and O. C. Church of the Seattle Police Dept., without threats, promises, or under conditions of duress.

Aiken's version of the same robbery and homicide in his statement (state's exhibit 7) taken at 3:30 a.m., April 26, 1965, is as follows:

I have been advised by Detective E. T. Mullen of the Seattle Police Dept., that I do not have to say anything, that I have a right to see an attorney before saying anything, and that anything I do say, could be used against me in a court of law.

. . . There was a middle aged, fat white man in the station office. Wheat and I walked into the office, . . . . Wheat and I remained in the office, until the man came back into there from the lube room. As the man started back into the office, I pulled out my silver colored, .22 caliber automatic, and pointed it at the man. I was carrying the gun in my inside jacket pocket. I think I held the gun in my left hand. I told the man to get back in there, and the three of us went back into a side room off the lube room. I told the man to give me the money, and he didn't say anything, just started to reach into his right front trousers pocket. As the man did this, Antonio grabbed the mans wrist, and reached into the mans pocket himself. Wheat pulled some money paper currency, out of the mans pocket. Wheat then reached into the mans front shirt pocket, and took out some more paper currency. I told the man to turn around, as he was facing me. The man turned around, and I put my gun in Wheats hand, as he reached for it. At the same time, Wheat handed me a small, white colored can of ether. I had got this can of ether, from the base dispensery, about two or three days before, and had given it to Wheat, and he had placed it in his car.

After Wheat had given me the can of ether, I poured a large amount into a rag I had picked up. I reached around the man, and quickly placed the rag over his mouth and nose. He struggled for a few moments, but I held on to him. The man went limp in my arms, and I laid him on the floor. Wheat handed my gun back to me, and he then grabbed a key, on a white string, that was tied to the mans belt loop. I stood, and covered the man with my gun, as Wheat went into the station office to check the cash drawer. Wheat came back and said there wasn't anything in there. I suggested we leave. The man was still laying on the floor, and he was mumbling. Wheat said we couldn't leave yet. I asked him what in hell he was talking about. Wheat replied that we had to shoot him, referring to the man on the floor. I told Wheat I wasn't going to shoot him, so Wheat told me to give him the gun. I then handed the gun to Wheat, and stepped back by the doorway. Wheat then leaned over the man on the floor, and fired at least four shots into the mans head. I believe another shot hit the man in the chest. The man was laying flat on his back when he was shot, and I estimate that Wheat held the gun about one foot away from the man, when he shot him. After the

shooting, I turned, and walked out of the station, going back to the car. A few moments later, Wheat came out, and walked back to the car. Wheat got in and we drove off. . . . Wheat counted the currency we had got from the Time Station man, and it totaled about seventy dollars, Wheat divided it, and gave me my half [initials inserted: A.N.A.], which was a little over thirty dollars. . . . Wheat had also taken a new battery from the station, and placed it on the rear floorboards of his car. . . . This is a true and voluntary statement, given freely by me, to Detective E. T. Mullen of the Seattle Police Dept, without threats, promises, or under conditions of duress. ˎ

### The Daniel Wolf Homicide

Wheat's version of the Enco station robbery and the Wolf homicide about midnight on April 12, 1965, is contained in his statement (state's exhibit 3) taken at 10 p.m. on April 25, 1965:

I have been advised by Detectives E. T. Mullen, and O. C. Church, of the Seattle Police Dept., that I do not have to say anything. That I have a right to see an attorney before saying anything, and that anything I do say, could be used against me in a court of law.

. . . I had gone a short distance when I noticed my oil indicator light, flashing red, so I pulled into a Enco Station, on the right side of the road. A young male attendant, came over to the car, and checked the oil for me. He told me I was about two quarts low, so I told him to put in two quarts of bulk oil. Meanwhile, Aikens had gotten out of the car, and went to the mens rest room. The attendant put the oil in the car. When he did this, Aikens came out of rest room, and went into the station office. The attendant told me the price of the oil, which was about sixty or seventy cents, and I gave him a five dollar bill. The attendant went into the station office with the bill, and I got out, and followed him into the office myself. At this time, Aikens pulled out his silver colored, .22 caliber automatic, pointed it at the attendant, and told him, this was a holdup. The attendant told Aiken [initials inserted: A.N.W.] that he would give him the money, or anything he wanted, and that he was a very religious man, and that he didn't want any trouble. Aikens replied that he didn't want to hear all that, and he just wanted

the money. The attendant then opened the cash box, taking out all the money, offering it to Aikens. Aiken told me to take it, so I did, placing it in my right coat pocket. At that time, Aikens asked if that was all the money, and the attendant said there was more money in the safe. Aikens asked if he could get in the safe, and the kid replied yes, and took a key out of the desk drawer, and opened a floor safe behind the counter. After opening the safe, Aikens told the attendant to step back, and he then took the money out of the safe himself. After getting the money out of the safe, either Aikens or the attendant replaced the top of the safe. Aikens then ordered the kid out from behind the counter and said, "lets go in the back." The three of us then walked back to a small store room, at the rear of the lube room. When we got back to the store room, the kid asked if he could pray. Aikens didn't say anything, and the kid got down on his knees, and started praying out loud. I don't recall what he said. The kid had his head down, and his hand over his eyes. He had said a few words, when Aiken shot him once in the head. Aiken was standing near the kids left side, holding his gun in his right hand. After firing the first shot, the kid fell forward, and Aiken shot him again. After the shooting, Aiken, and I, walked out to where I had left my car, parked at the outside gas pumps. We got in, and I drove back to Paine Field. On the way back, Aiken divided up the money we had gotten. We got about three hundred dollars in all. . . .

This is a true and voluntary statement, given freely by me to Dets. E. T. Mullen, and O. C. Church of the Seattle Police dept., without promises, threats, or under conditions of duress.

Aiken's version of the same robbery and homicide is contained in state's exhibit 14, taken on April 26, 1965, at 10:45 a.m.:

I have been advised of my rights to an attorney by Sgt. R. Schoener and Det. D. Shearn of the Seattle Police Dept. I have been told I need not say anything and anything I might say can be used against me in a court of law. I wish to make the following statement.

On a Sunday nite about two weeks ago sometime in the middle of April I was with Antonio Wheat, an airman I am stationed with at Paine Field. We were in Wheats car a 1954 Ford 2 tone brown. It was about mid-

night and Antonio was driving in the So. end of Seattle on Empire Wy So. We had discussed maybe robbing a gas station and as we drove by an Enco Station Wheat said that looks like a good one there is only one man there. So he drove a couple blocks up the side street beside the station [initials inserted: A.N.A.] went around the block and parked on the same street just north of the station. We walked across the street and the attendant was alone in the lube room at a bench just in front of a car. He had his back to us. He was working on a car battery. The attendant was about 23 or 24 years old with blondish hair. Wheat asked the attendant what could cause his car to vibrate. Wheat and the attendant discussed the car for a few mintues. I was carrying a .22 cal auto. Italian make [initials inserted: A.N.A.] in my coat pocket. I took the gun out my pocket holding it in my left hand. I told him to turn around but I guess the attendant didn't hear me so I said it a little louder. The attendant asked if this was a holdup when he saw the gun. I told him what did it look like. He then said he didn't want any trouble and would give us the money. Wheat walked to the office followed by the attendant and I walked in the rear. I had put the gun back in my pocket. The attendant took the money from a cash box on the end of a counter and laid it down. I picked it up and put it in my pocket. We were getting ready to leave when the attendant said he had more money in the [initials inserted: A.N.A.] safe. Wheat asked him where the safe was and could he open it. The attendant said he could. The attendant pulled open a desk drawer so Wheat went around to see what he was doing. The attendant showed Wheat a key. The attendant picked up the key and bent down just behind him in the corner and opened up the floor safe. Before the attendant could get the door off Wheat pulled him back and took the door off himself. Wheat reached in the safe, started pulling out the money and put it in his pocket. He then asked the attendant if he could get [initials inserted: A.N.A.] into the bottom of the safe but the attendant didn't have that key. Wheat then put the safe door back on. Wheat then said lets go and pushed the attendant and we all went back to the lube room. Wheat told the attendant to go into a small side room just off the rear [initials inserted: A.N.A.] of the lube room. The attendant said the money was insured. He was very religious and didn't want to die. Wheat pulled out a small switch blade knife and forced

the attendant into the room. Wheat said to me [initials inserted: A.N.A.] do you want to do it or should I. I said I wouldn't do it. Wheat handed me his knife and I gave him my gun. I knew he was going to shoot the attendant. I closed the knife and put it in my pants pocket. When Wheat pointed the gun at the attendant [initials inserted: A.N.A.], the attendant said he wanted to pray. The attendant got down on his knees and covered his face with his hand. I turn around and walked towards the front of the [initials inserted: A.N.A.] station. I heard one shot then a few seconds later I heard another shot. Wheat then came out of the room. We walked to the car and drove off. I knew Wheat had shot the attendant. Wheat drove south on Empire Way and then pulled up behind a store. He then counted the money. I think it was around $200.00 in cash, and also some checks and other papers. He then gave me about half of the money. I think I got $94.00. Wheat started to drive around town. I told him lets leave and we drove back towards the base. On the way [initials inserted: A.N.A.] he gave me back my gun and I gave him his knife. We got back about 2:00 a.m.

The above is a true and voluntary statement given by me to Sgt. R. Schoener & Det. Shearn of the Seattle Police Dept without threat duress or promise of any kind.

(The first page of exhibit 14 contains a sketch by Aiken of the layout of the Enco Service Station with the lube room designated where Daniel Wolf was shot.)

### THE JAMES HARP HOMICIDE

Wheat gave three versions of the robbery and Harp homicide April 24, 1965, at the Douglas Service Station. The first version was contained in his statement (state's exhibit 1) taken at 11 p.m. on April 24, 1965, in which he asserted that Aiken fired the fatal shot. A similar version was contained in his statement (state's exhibit 2) taken at 3:55 p.m. on April 25, 1965. The final and corrected version of the Douglas Service Station robbery and the Harp homicide was contained in his statement (state's exhibit 6) of 1:35 a.m. April 26, 1965, as follows:

The officer taking this statement has advised me that I do not have to make any statement and if I do that it

may be used [initials inserted: A.N.W.] as evidence against me in court.

He has also advised me of my right to an attorney before I give any statement. I wish to make a correction to a statement I gave Detective Mullen and Sgt. Crider dated April 25, 1965 at 3:55 p.m. Approximately ten minutes prior to the start of this statement I talked to my friend Arthur Aiken and now have decided to tell the complete truth. On April 25, 1965 I was in Judge Hoar's court and although I was charged with murder in the first degree I more than ever want to tell the truth. While I was in court the judge informed me of my rights and also told me I was entitled to an attorney.

When I drove into the Douglas Service Station on April 24, 1965 at approximately 3 a.m. Arthur Aiken was awake. I got out of the car and got the key on a can about the size of a beer can to the rest room. I then used the key to unlock the door to the men's rest room and went in to urinate. I then gave the key back to the service station attendant. I then walked to the car and got in on the driver's side. We then sat and talked for awhile. I fell asleep and then woke up at approximately 4:15 a.m. Arthur Aiken was asleep. I then walked into the station office to use the phone. I called Paine Field Air Base and there was no answer. I talked to the service station attendant until his two friends drove up and left. After they left I asked the attendant for change for a twenty dollar bill. We then walked out to the cash box by the pumps.

After he opened the cash [initials inserted: A.N.W.] box I pulled the 22 silver automatic out of my right pocket and told him "give me all the money, this is a holdup." He then told me to take all the money as it was insured and he wasn't. He took all the currency out of the cash box and handed it to me. I took the currency with my left hand and put it in my left coat pocket. We went back in the office and I told him "to get the key to the men's rest room." He picked up the key from the counter and I told him to walk into the men's rest room which he did, and I followed him. After we got into the rest room he sat down on the toilet and before he sat down he said "don't kill me." I asked him if he could describe me and he said he didn't know. I also asked him if he could describe the car if he had to and his reply was "don't kill me." I asked him again if he could describe

318

the car and he said "he probably could." He started talking and I don't remember what he said and I told him to shut up and he kept on talking. I then released the safety on the gun and the first shot went off accidentally. He slumped over and I then fired two more shots after I aimed at his head. After the first shot was fired he dropped the key on the floor. I then went outside and ran to the car. I then got in the car and started the motor. Arthur Aiken was still asleep. As I stated in the previous statement I drove back to the base and on the way I counted the money which amounted to $120. The 22 automatic I used I had taken from Arthur Aiken's pocket on the early morning of April 21 or April 22, 1965. When I sneaked into his unlocked room at the barracks. I was dressed in a brown suit, white shirt, black shoes and black sox and had on a three quarter length tan topcoat. I may have taken the wrist watch from the attendant and I therefore give permission to search my locker on the base at Paine Field. This is a true and voluntary statement given freely to Detective Church and Mullen [initials inserted: A.N.W.] and Sgt. Crider without fear threats or promise of any kind. This statement started 4-26-65 at 1:35 a.m. and ended 4-26-65 at 2:45 a.m.

Aiken's version of the same robbery and homicide (state's exhibit 5) given at 1:20 a.m., April 26, 1965, is as follows:

On 4-23-65 I left Paine Air Base, with Antonio Wheat, in his car a 1954 Ford 4 dr. Sedan two tone brown. This car also has a black hood. I believe we left the base about 3:30 p.m. Antonio told me that he had to go to his girls house, because he had to drive her to the Laundromat. We got to his girls house about 6:30 p.m. Her name is Dorothy and she lives out on holly park drive in the south end of Seattle, Wn. Antonio and I went into the house, and stayed about one hour. When we left we drove one of Dorothys sisters and another female friend to their home, then Antonio and I drove back to Everett, Wn. and drove to a friends home Eric Brown. When we got to Browns home he was going to take a bath so Antonio and I walked over to another Airmans home Edwin Jones home. I wanted to go there because I had lent him two records that belonged to me. I picked up one of the records and not the other as Jones wife had lent it to one of her friends. Antonio and I then walked

back to Eric Browns house and he was ready to go with us so all three of us got into Antonios car and drove to Seattle. We left Brown house about 10:30 p.m. 4-23-65. We all drove down to a dance place near 2nd & Yesler in Seattle, the name of the place was Macks Show Place. Eric got out of the car to see if there were any people there, and jumped back in and said it didn't look like there was much action. So we drove up to 12th & Jackson to another spot the Black & Tan. We all got out of the car and walked in the entrance to this place and looked inside but we did not want to pay the cover charge as there wernt to many people there. We all got back into the car, and drove to another place we had heard about. I believe they call it the Go-Go this is the name. We were stopped by the officer at the door and because we did not have Washington State I.D. liquor cards, he would not let us in. We all got back into the car and started to head for Everett to take Eric back home. By this time it should have been a little after 12 midnite. I do not recall what time we dropped Eric at his home because I had gone to sleep in the back seat. I dont recall the time but when Eric got out of the car I woke up and got in the front seat next to Antonio. After we dropped Eric off Antonio drove to a gas station on highway 99 north of Everett, Wn. and Antonio got out of the car and went to the rest room. I remember that when Antonio got back into the car after using the rest room and we drove toward Seattle, Wn. The next time I woke up I saw that we were in a Douglas Gas Station some place in the northend of Seattle. I woke up and asked Antonio why we were parked there and he said that he pulled in there because he was sleepy and wanted to rest a little while. I remember that Antonio got out of the car I don't know where he went. I went back to sleep and I did not wake up again until we were in the parking lot across the street from the main gate at the Air base. I dont recall what time this was but it was light. Antonio and I both got out of the car and went into the base. We both live in the same barracks and I live upstairs and Antonio lives down stairs. I went to my room and he went to his. I have read this statement of four pages given by me freely and voluntarily without fear threats or promise. I have been advised of my right to legal counsel before giving this statement and have also been advised this statement could be used against me in a court of law. I

wish to give this statement after having been advised of this.

Although numerous assignments of error have been made on this appeal by each of the defendants, the crucial contention for review is the asserted denial of the defendants' constitutional rights as guaranteed by the fifth, sixth and fourteenth amendments of the federal constitution by reason of the admission into evidence of these statements made by the defendants.

The evidence relative to the interrogation of Wheat and Aiken is disclosed in the record of a 3-day pretrial hearing that was held pursuant to Rule of Pleading, Practice and Procedure 101.20W, RCW vol. 0, to determine the admissibility of Wheat's and Aiken's incriminating statements, and the admissibility of other evidence. Further evidence appears in the record of a supplemental hearing, ordered by this court, with respect to the confessions of the defendant Aiken and is discussed later in the opinion.

In order to properly evaluate the evidence adduced at the evidentiary hearings in light of the ultimate findings of the trial court, we first turn to a discussion of the applicable legal principles governing the admissibility of these challenged statements.

Since defendants Wheat and Aiken were tried in October, 1965, we are not directed to follow the recent exclusionary rule announced prospectively by the Supreme Court of the United States in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 Sup. Ct. 1602 (1966), wherein the following guidelines were incorporated, clarifying and extending its earlier decision in *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 Sup. Ct. 1758 (1964), (Mr. Chief Justice Warren for the court):

> [W]e hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the

exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that [1] *he has the right to remain silent,* [2] *that anything he says can be used against him in a court of law,* [3] *that he has the right to the presence of an attorney, and* [4] *that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.* Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.* (Italics ours.) 384 U.S. at 478, 479.

Chief Justice Warren, in *Johnson v. New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882, 86 Sup. Ct. 1772 (1966), explained the reasons for not making *Miranda* retroactive, stating:

As for the standards laid down one week ago in *Miranda,* if we were persuaded that they had been fully anticipated by the holding in *Escobedo,* we would measure their prospectivity from the same date. Defendants still to be tried at that time would be entitled to strict observance of constitutional doctrines already clearly foreshadowed. The disagreements among other courts concerning the implications of *Escobedo,* however, have impelled us to lay down additional guidelines for situations not presented by that case. This we have done in *Miranda,* and *these guidelines are therefore available only to persons whose trials had not begun as of June 13, 1966.* (Italics ours.)

We therefore deal here only with *Escobedo;* wherein Justice Goldberg, speaking for the court, announced the following constitutional safeguard:

[W]here, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, [1] *the suspect has requested and been denied an opportunity to consult with his lawyer, and the police*

*have not effectively warned him of his* [2] *absolute con-stitutional right to remain silent,* the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution as "made obliga-tory upon the States by the Fourteenth Amendment," *Gideon v. Wainright,* 372 U.S., at 342 [9 L. Ed. 2d 799, 83 Sup. Ct. 792], and [3] *that no statement elicited by the police during the interrogation may be used against him at a criminal trial.* (Italics ours.) 378 U.S., at 490-91.

Our interpretation of *Escobedo* and that which has been followed by law enforcement officers since 1965, prior to *Miranda,* came in *State v. Darst,* 65 Wn.2d 808, 399 P.2d 618 (1965), where, considering the implications of the opinion, we foresaw the Supreme Court's holding in *Miranda* by making the following observations as to the warning that should be given by police officers before interrogating a person in lawful custody:

It seems to us that a forthright, clearly provable warning given to one in lawful custody informing the accused in unmistakable terms that [1] *he has a right to counsel and* [2] *a right to remain silent, and* [3] *that anything said or written by him may be used against him in evi-dence,* would do much to eliminate a sizable quantum of claimed error and keep the investigation channeled to its true purpose: ascertaining the guilt or innocence of the party accused. We see no reason for so simple a caveat not being given routinely and required as a part of mod-ern police administration. (Italics ours.)

It is certain now that this is what the court intended in *Escobedo,* for in re-enunciating its tenets in *Miranda,* Chief Justice Warren explained:

Our holding there [*Escobedo*] stressed the fact that the police had *not* advised the defendant of his constitutional privilege to remain silent at the outset of the interroga-tion, and we drew attention to that fact at several points in the decision, 378 U.S., at 483, 485, 491. *This was no isolated factor, but an essential ingredient in our deci-sion.* The entire thrust of police interrogation there, as in *all* the cases today, was to put the defendant in such an emotional state as to impair his capacity for rational judgment. The abdication of the constitutional privilege —*the choice on his part to speak to the police*—*was not*

*made knowingly or competently because of the failure to apprise him of his rights;* the compelling atmosphere of the in-custody interrogation, and not an independent decision on his part, *caused* the defendant to speak. (Italics ours.) 384 U.S. 436, 465.

In this context, in *Escobedo,* the United States Supreme Court, with significant attention focused on the *admitted denial* of the defendant's continued requests for counsel, struck down Escobedo's admission of complicity in a murder plot and his later confession, reasoning that Escobedo was unwarned of his rights and thus unaware a statement admitting complicity in the murder could be used against him, under Illinois law, just as effectively as if he had admitted firing the fatal shots.

The United States Supreme Court, in *Escobedo,* recognized however that an accused may intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pretrial stage or at trial (footnote 14 of the opinion; *Johnson v. Zerbst,* 304 U.S. 458, 82 L. Ed. 1461, 58 Sup. Ct. 1019, 146 A.L.R. 357 (1938) ); but that no knowing and intelligent waiver of any constitutional right could be said to have occurred under the circumstances of Escobedo's interrogation, the defendant being unaware of his rights.

The most recent post Escobedo expression of "waiver" is the so-called "Dorado Rule" (See *People v. Dorado,* 62 Cal. 2d 338, 398 P. 2d 361 (1965), *cert. denied,* 381 U.S. 946 (1965), cited by the Supreme Court of the United States in *Miranda, supra,* at 471, 478), which essentially holds that a defendant cannot be charged with waiver of a constitutional right unless it appears that he was aware of its existence and its surrounding safeguards and voluntarily and intelligently elected to refrain from asserting it. As stated by the California court:

". . . a waiver is an intentional relinquishment or abandonment of a known right or privilege. A waiver cannot be effected unless it is intelligently and competently given." [*Griffith v. Rhay,* 282 F.2d 711, 717 (9th Cir. 1960).]

In the absence of evidence that defendant already knew that he had a right to counsel during interrogation, the failure of the officers to inform him of that right precludes a finding that he knowingly waived it.

*Escobedo* also holds that the accused has the right not to incriminate himself and to remain silent, and that, if any self-incriminatory statements are to be admissible, he must waive that right. Such waiver presupposes knowledge of the right to remain silent; in the absence of evidence of such knowledge, the waiver requires a warning to the accused of that right.

. . . .

Obviously, defendant could not waive the right to remain silent unless he knew of that right. . . . *"The defendant . . . cannot be charged with a waiver of the privilege unless it appears that he was aware of its existence and its surrounding safeguards and voluntarily and intelligently elected to refrain from asserting it."* (Italics ours.) (Footnote omitted.)

■ Summarizing the *Escobedo* decision and other cases cited herein, to be admissible in evidence, the record must show that the incriminatory statements given by a defendant in custody at the accusatory stage, were freely and voluntarily made by him after he has been apprised of his right to remain silent, his right to counsel before making any statement, and the warning given that anything he does say may be used against him in a court of law. It must also appear that the accused knowingly and intelligently elected to refrain from asserting these rights at that time in answering the questions of police.

With these principles in mind, we now turn to the inquiry whether the defendants here were properly apprised of their constitutional rights and with such knowledge voluntarily waived them during the interrogations that elicited their confessions.

### INTERROGATION OF WHEAT

Wheat maintains that, under *Escobedo,* he was never properly and adequately warned of his constitutional rights and the trial court committed error by receiving his incrim-

inations in evidence against him. The trial court found, however, that before the oral statements made by Wheat and the statements contained in exhibits 1, 2, 3, 4, 6, and 9 were given, he was fully advised (1) of his right to counsel before making any statement, (2) his right to remain silent, and (3) that anything which he did say could be used against him in a court of law. The court further found all warnings given Wheat were in the form of the standing order of the King County sheriff's office (exhibit 13), which is a directive to officers conducting in-custody interrogations. The directive states in pertinent part:

It is imperative that each officer interrogating a criminal suspect give most careful consideration to the suspect's Constitutional Rights as interpreted by recent court decisions. Incriminating statements, either verbal or written, elicited by police during an investigation, may be invalidated if the suspect is not effectively warned of his rights to remain silent and if his right to counsel or legal advice is denied.

Prior to taking a statement, oral or written, from any person under arrest actually suspected of a criminal offense, the interrogating officer shall effectively advise the suspect as follows:

(1) that he has the right to remain silent,
(2) that it is his right to consult with and be advised by an attorney before making any statement,
(3) that anything he says may be used against him in a criminal proceeding.

In reaching this conclusion on disputed facts, the court based its decision on the following exhibits and testimony summarized as follows:

1. Warning of Lieutenant Paul T. Hancock, officer of the day at Paine Field, informing the defendant Wheat of his rights under Article 31 from the Manual of Courts Martial, Uniform Code of Military Justice; and corroborated by Airman Bennett, who was present at the time.

2. Warning by Everett Mullen of the Seattle Police Department after apprising Wheat his car was observed at the scene of a homicide, and who testified that he told the defendant he did not have to say anything, that he could

see an attorney before he did say anything, and anything he did say could be used against him in a court of law; corroborated by the testimony of Lieutenant Hancock, and Sergeant Hartshorn of the King County sheriff's office.

3. Warning by the same officers after Wheat was identified in a lineup by two witnesses as the man they had seen at the service station where James Harp had been murdered.

4. Warning by Sergeant Ron Crider of the King County sheriff's office prior to taking statement exhibit 9; and corroborated by Detective Frank Chase of the Seattle Police Department.

5. Warning given prior to the taking of statement exhibit 1 before Detective Mullen of the Seattle Police Department and Detective Sergeant Crider of the King County sheriff's department.

6. Warning by Detectives Mullen and Crider, given in King County Sheriff Porter's office prior to giving statement exhibit 2.

7. Warning by Judge Hoar at the defendant's justice court arraignment on murder in the first degree.

8. Warning by Detectives Mullen and O. C. Church, of the Seattle Police Department, prior to statement exhibit 3.

9. Warning before taking statement exhibit 4, by Detectives Crider and Church.

10. Warning by Detectives Church, Mullen, and Crider, before taking statement exhibit 6 in which Wheat confessed to the killing of James Harp.

In addition to these oral warnings, the court found, and we have set out, the written warnings that appear in each statement, testified to as being read and signed or initialed by the defendant Wheat on each page, and corrected by him at various places already noted in the statements.

From our reading of the record, therefore, the trial judge was entitled to believe that Wheat had the above rights called to his attention no less than 16 times; and under these circumstances, was found to have given the noted statements, only after such warnings of his rights had been given.

The undisputed finding of the court was that at no time did Wheat exercise his rights in any manner by requesting an attorney or by refraining from giving the challenged statements.

The trial judge further found that by reason of the defendant's intelligence, which was described as superior and equivalent to a person with an advanced college education, that defendant Wheat fully understood his rights and that the statements, *supra,* were freely and voluntarily given.

Our independent review of this evidence (see *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963); *In re McNear v. Rhay,* 65 Wn.2d 530, 398 P.2d 732 (1965) ) reveals that in the first of his six statements (exhibit 9), Wheat gave an innocuous account of his activities on the previous night, April 23, 1965. In the next statement (exhibit 1), when faced with inconsistencies in his story, Wheat admitted knowledge of the homicides but denied implication, naming Aiken as the one who had held up the Douglas station and killed Harp. The next day when confronted with the murder weapon, retrieved from his duffel bag in an air base storeroom, Wheat admitted he had participated in the Douglas station robbery two nights before, but stayed with his story that Aiken had fired the fatal shots (exhibit 2).

These three statements were found to have been given freely and voluntarily, without threat or fear and only after the defendant had been advised of his constitutional rights and had elected not to exercise them in any manner (finding of undisputed fact 16, pretrial hearing).

Finally, after being advised of his rights, under *Escobedo,* at the justice court arraignment before Judge Hoar, and after the police repeatedly warned him again, Wheat freely gave three more statements. In the first (exhibit 3), he admitted participation in the Wolf homicide but named Aiken as the triggerman. In the next statement (exhibit 4), he admitted participation in the Owen Fair homicide, and again placed the responsibility for the killing on Aiken. In his last statement (exhibit 6), Wheat, subsequent to a con-

frontation with Aiken who had called him a liar, admitted that he and not Aiken had fired the fatal shots killing James Harp. As in the first three statements, the trial court found that these incriminating admissions and the confession were given freely and voluntarily only after the defendant had been advised of his constitutional rights and had not elected to exercise them in any manner.

Considering all these circumstances, the evidence is overwhelming that Wheat knowingly and intelligently waived his constitutional rights at this point in the proceedings against him. He unequivocably and with full appreciation of the consequences made these incriminations, after laboring with his conscience for "putting the finger" on Aiken as the one who had fired the shots. (Court's ruling at pretrial hearing.)

We hold that the trial court correctly determined that all the statements of Wheat were freely and voluntarily given with knowledge and understanding of his constitutional rights, under *Escobedo,* and were admissible against him. See *Hiram v. United States,* 354 F.2d 4 (1965), cited with approval in *Miranda; United States v. Currie,* 354 F.2d 163 (1965); *Cephus v. United States,* 352 F.2d 663 (1965), *cert. denied,* 384 U.S. 1012 (1966); *United States v. Drummond,* 354 F.2d 132 at 150, *cert. denied,* 384 U.S. 1013 (1966); *People v. Dorado, supra.*

The argument is made that there could be no knowing and intelligent waiver by Wheat since, as a layman, Wheat could not know that, in four of his six statements, the admission of complicity in the three crimes was equivalent in law to having fired the fatal shots himself, and that absent this knowledge, there could be no valid waiver. The parallel is drawn to similar admissions made by Danny Escobedo in that case noted above. We find this argument to be without merit on the facts of this case.

The warnings given to Wheat (none were given to Escobedo) are clear and express. To argue that after such warnings the accused must also be advised that an admission of complicity in the crime is in law an admission of the

crime, denies the very purpose for which the warnings were given. Wheat was advised that *"any statement made by him could be used against him in a court of law."* (Italics ours.) This warning has as its purpose, the awareness by the individual so warned, of this very situation complained of.

Therefore Wheat, in choosing to answer questions put to him by the police without benefit of counsel, cannot now complain that he incriminated himself out of ignorance. *United States v. Currie, supra,* at 165, 166; *People v. Dorado, supra.*

Wheat further contends that the incriminatory statements, given by him to police officers after his justice court arraignment, should have been excluded from evidence; since he was at that time without the effective assistance of counsel. This argument is based on the authority of *People v. Waterman,* 9 N.Y.2d 561, 175 N.E.2d 445 (1961), long followed in New York; recognized by us in *State v. Moore,* 61 Wn.2d 165, 377 P.2d 456 (1963); and adopted as a federal constitutional standard in *Massiah v. United States,* 377 U.S. 201, 12 L. Ed. 2d 246, 84 Sup. Ct. 1199 (1964). See also *McLeod v. Ohio,* 381 U.S. 356, 14 L. Ed. 2d 682, 85 Sup. Ct. 1556 (1965). The rule, succinctly stated, is as follows:

> Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.
>
> . . . .
>
> By the same token, they [officers] may not circumvent the defendant's privilege against self incrimination by introducing into evidence inculpatory statements obtained from him (following indictment) at a private examination prior to the trial, *at least where, as here, he was not first advised of his privilege and his right to the assistance of counsel.* (Italics ours.) 9 N.Y.2d at 565, 566.

We agree with the manifest purpose of this constitutional standard; since by the finding of the indictment or the filing of a complaint or information, under our practice, the

formal criminal action is commenced against the defendant and presumably imports that the state has legally sufficient evidence of the defendant's guilt of the crime charged. The necessities of appropriate police investigation to "solve a crime, or even to absolve a suspect cannot be urged as justification for any subsequent questioning of the defendant." *Spano v. New York,* 360 U.S. 315, 323, 3 L. Ed. 2d 1265, 79 Sup. Ct. 1202, 1207 (1959); *People v. Waterman, supra,* at 565.

▓ The applicability of this constitutional standard to the instant case properly relates only to the defendant's corrected version (state's exhibit 6) of the Harp homicide, for which he had been formally charged at his arraignment in justice court. No formal proceedings had been commenced against Wheat for the Wolf and Fair murders and the police officers properly interrogated him with respect to these offenses. And since the defendant's confession, that he and not Aiken had fired the fatal shots into the kneeling figure of James Harp, was arrived at only after he had been properly warned of his privilege against self-incrimination and his right to the assistance of counsel, *People v. Waterman, supra,* we are satisfied that this interrogation, which followed the confrontation, did not violate the defendant's fundamental right to the assistance of counsel, as enunciated in *Massiah, supra.*

### INTERROGATION OF AIKEN

Our review of the facts and circumstances surrounding the interrogation of the defendant Aiken is invaluably aided by the fact that his interrogation was tape recorded, virtually in its entirety, without the knowledge of either the defendant or the interrogating officers. It proved necessary, however, due to the poor quality of the tape recording at various points in the interrogation to remand this case for a further hearing on the issue of voluntariness, so that our ultimate decision in the case would be based on a record which was complete in every respect. The evidence relative to Aiken's interrogation, therefore, is disclosed in

the records of both evidentiary hearings held to determine whether the defendant's constitutional rights had been violated in any respect by the taking of his confessions and their admission in evidence at his trial. The following facts as found by the trial court are undisputed, except as hereinafter noted.

After Aiken's apprehension in Blaine, Washington, by the border patrol at 4:19 p.m. on April 25, 1965, he was placed under arrest by a Blaine city policeman for carrying a concealed weapon (a fully loaded .25 automatic) and transported to the Whatcom County jail at Bellingham. The officers of the border patrol, state patrol, city of Blaine, and Whatcom County sheriff's office, all testified that from the time of his apprehension, Aiken's attitude was sullen and quiet and he held his head down. In fact, during his entire detention in Bellingham, pending his transport to Seattle, Aiken only asked one question concerning his detention, remaining silent even to the extent of refusing to answer routine identification questions by the booking officer.

At approximately 10 p.m. that evening, Detective John Leitch of the Seattle Police Department and Detective Sergeant Frank Chase of the King County sheriff's office arrived in Bellingham to drive Aiken to Seattle. At that time, the police officers advised him that he did not have to make any statement to them, that he had a right to an attorney before making any statement, and that anything he did say could be used against him in a court of law. Detective Leitch asked Aiken if he understood his rights, and the defendant nodded and said "yes." The defendant was very quiet. He had his head down and his attitude was surly and cool.

En route to Seattle, Detective Leitch inquired of the defendant whether he, as a member of the military, was familiar with article 31 of the Uniform Code of Military Justice, which prohibits compulsory self-incrimination. The defendant replied that he was familiar with it. The article in pertinent part reads as follows:

*Art. 31. Compulsory self-incrimination prohibited*

(b) No person subject to this chapter may interrogate,

or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Detective Leitch further advised Aiken that he was being held on a charge of homicide and robbery. The defendant denied any involvement and the officers did not discuss the matter further.

Upon their arrival in Seattle, at approximately midnight, the police officers took Aiken to an interrogation room located on the 10th floor of the County-City Building. At 12:20 a.m., April 26, 1965, an interrogation began there, which is recorded on exhibit 11, the first tape recording, and prior thereto the defendant was again cautioned by Detective Chase of his constitutional rights as enumerated. This third warning was corroborated by Detective Everett Mullen of the Seattle Police Department, who participated in the interrogation, and is admitted by Aiken as having been given to him.

During the conversation that followed between Sergeant Chase, Detective Mullen and the defendant Aiken, the defendant had his head lowered, mumbled his words and was difficult to understand. The interview room is not soundproof, and during the conversation the detectives heard, and the recording discloses, several noises from outside the room, including a laundry running on the floor above, a swinging gate just outside the interview room, and traffic noises outside the window.

During the interrogation, Aiken read a statement by the defendant Wheat (exhibit No. 3) pertaining to the Wolf homicide as charged in count 2 of the information, wherein Wheat accused Aiken of the callous slaying of the victim, while he was on his knees praying. Aiken insisted that the statement was a counterfeit, and that Wheat was lying.

Shortly thereafter, at 1 a.m., Chief of Detectives Thomas Nault entered the interview room. Chief Nault advised the

defendant that further evidence had been received from Airman Brown, a friend of Aiken, which indicated that the murder weapon was Aiken's. Nault corroborated the fact that Wheat had given the statement read by Aiken, and that they wanted to give Aiken the opportunity to give his side of the story before he was charged with murder; that if Wheat was lying, they wanted to know it.

Aiken then requested that Wheat be brought down to the room to verify the statement. The request was granted, and Wheat was brought to the interview room. While standing in front of Wheat, Aiken asked him if he had given the Wolf statement, and Wheat acknowledged that he had. In response to Wheat's refusal to say the statement wasn't true, Aiken exclaimed the statement was a lie and he would tell the officers what really happened.

Aiken immediately answered questions concerning the Wolf homicide. At 1:15 a.m. he was asked if he wished to give a statement of his version and he replied that he would.

Upon this confrontation with Wheat, the defendant Aiken ceased to mumble his words, spoke positively, and held his head up. He appeared to be upset and excited.

At 1:20 a.m. Sergeant Chase and Detective Leitch began a conversation with Aiken in the interview room concerning the Harp homicide as charged in count 3 of the information. This conversation was recorded on exhibit 12 until 2:22 a.m. Both detectives and Aiken were aware that this conversation was being taped.

At the outset of said interrogation, Sergeant Chase admonished the defendant Aiken of his right not to make any statement, that he had a right to an attorney before making any statement, and that any statement given by him could be used as evidence in a court of law. Aiken stated that he understood this, and when asked whether he still wished to give a statement, he replied, "yes."

The Fair and Wolf homicides, as charged in counts 1 and 2, were being investigated by the Seattle Police Department, and the Harp homicide was being investigated by the

King County sheriff's office. It was the intention of the investigating officers to obtain separate statements for each homicide. During the conversation, as recorded on exhibit 12, Sergeant Chase began writing exhibit 5, relative to the Harp homicide. Sergeant Chase, however, did not complete exhibit 5 during the recording, since Aiken talked not only about the Harp homicide, but also the Fair and Wolf homicides. After the recorded conversation was ended, exhibit 5 was completed.

At approximately 3 a.m. on April 26, 1965, Detectives Mullen and Orin Church interrogated Aiken in the interview room concerning the Fair homicide as charged in count 1 of the information. At the outset of the interrogation, Aiken was advised by Detective Mullen that he did not have to say anything, that he had a right to see an attorney before making any statement, and that anything he did say could be used against him in a court of law. The defendant Aiken stated that he understood these rights. Mullen then asked the defendant if he desired to use the telephone. This offer was not accepted.

During this interrogation by Detectives Mullen and Church, Aiken talked about his participation in the Fair homicide. At this time, exhibit 7 was written by Detective Mullen and signed by Aiken. All conversations with Aiken ceased shortly before 5 a.m., and he was placed in a cell at the King County jail.

Aiken was not questioned further until 10 a.m. on April 26, 1965, when Detectives Richard Schoener and Dana Shearn interrogated Aiken in the county jail. Detectives Schoener and Shearn had never met Aiken before, and were not present in the King County courthouse during the prior questioning of Aiken. Prior to the interrogation, Detective Schoener advised Aiken that he did not have to say anything, that he had a right to an attorney before making any statement, and that anything he said could be used against him in a court of law. Aiken stated that he understood this admonition. Detective Schoener proceeded to write exhibit 14, which was signed by Aiken. During this

interrogation, Aiken drew the sketch of the Wolf homicide scene and signed it. The interrogation concluded at approximately 11:20 a.m.

Aiken maintained in the original pretrial hearing that he, repeatedly, requested counsel at various times; but that all of the officers, including the jailor at the county jail in Bellingham, Detective Leitch, and the two interrogating officers, completely ignored any and all requests made by him.

The trial court at the first hearing was aware that such a request could have been made, considering that at numerous places on the tapes, Aiken's answers could not be heard; and that throughout the interrogation, at least prior to the confrontation, he spoke with his head down and indistinctly.

The trial court expressly noted in finding of disputed fact 1, however, that Officer John Leitch and the officers, who questioned Aiken in Seattle during the period in which he stated he requested counsel, each testified that, although it was possible, they did not, at any time, hear Aiken request an attorney, or to contact any person, other than Wheat. The arresting officer at Blaine and the Whatcom County jailor also testified that Aiken, in their presence, was extremely quiet and sullen and made no request for counsel at any time.

Believing this testimony, which was fully supported by the record, and not discovering anything on the tapes to the contrary, the trial court entered conclusions as to this disputed fact by holding that Aiken did not, at any time, *at least in words audible* to any of the officers talking to him, request an attorney. (Conclusion of disputed fact 1—pretrial conference.)

Upon this court's discovery of what appeared on the tape (exhibit 11) to be a request for counsel and pursuant to our order of May 5, 1967, and the procedure outlined therein, the trial court redetermined the issue. It concluded that Aiken *had* made a request for counsel on at least two occasions, after reading Wheat's statement of the Wolf

homicide and before the confrontation. The transcription by the trial court reads as follows:

> Q. You tell us the truth, then, if this is a lie. (A. I'd like to see an attorney, I won't mess around with you.) [1]Q. This matches all the physical evidence. The guy's not lying. A. He is lying. Q. We've got the physical evidence at the scene. A. He is lying. Q. What's he lying about? What's he lying about? Tell us what he's lying about. (A. I want to see an attorney.[2]) Q. Well what's he lying about? A. He is lying. Q. Where?
>
> Show us where he is lying in (t)here. A. . . . .[3] Q. Just one place, one place in it he's lying. Just one place. Just one place that he's lying. A. . . . .[4]

[1] and [2]The trial court reporter's transcript indicates that the response at this point is unintelligible. However, as above indicated monitoring of the tape would appear to indicate the above bracketed statements.

[3]The tape reveals that Aiken's answer at about this point is difficult to apprehend. However, again, careful monitoring suggests the possibility of a request for counsel at this point.

[4]The tape at this point likewise reveals Aiken's answer to be somewhat indistinct. However, again, careful monitoring indicates either a fourth request for counsel or the possible statement: "I don't care to say anything else to that."

As in the first hearing, the trial court found that Aiken's requests to see an attorney, or indication that he desired to remain silent, were inaudible to the interrogating officers and were not heard by them. Due to the importance of this disputed finding of fact, we have set it out below in its entirety, including the reasons given to support the trial court's conclusions. The finding reads:

> 2. That said requests were inaudible to the interrogating officers and were not heard by them. The officers did not at any time hear the defendant Aiken request an attorney, or that he did not want to say anything. The officers did not ignore any request for an attorney or a desire to remain silent, for they heard no such requests and could not act upon a word or statement they did not hear. This conclusion is based upon the following:

a. All law enforcement officials who had contact with the defendant Aiken testified that they at no time heard an audible or intelligent request for an attorney from the defendant Aiken. If they had heard an audible or intelligent request or a desire to remain silent, the interrogation would have stopped;

b. Prior to the confrontation with the defendant Wheat the defendant Aiken held his head down; he spoke softly, slurred his words, and he let his voice trail off. This was confirmed when the defendant Aiken testified before the Court during the original pretrial hearing. During his testimony he slurred his words, spoke softly with an accent difficult to understand.

c. The interview room in which the questioning of defendant Aiken occurred was not soundproof and numerous noises could be heard by the interrogating officers which seriously interfered with their understanding of defendant Aiken's responses;

d. During the interview recorded on Exhibit No. 11 the interrogating officers were not sitting next to the defendant Aiken. Instead, Sergeant Chase was across the room behind a desk and Detective Mullen was sitting in the middle of the room as shown on Exhibit Nos. 140 and 141, and defendant Aiken was not close to the microphone.

e. The trial Court and counsel experienced great difficulty in determining whether or not a request for an attorney could be heard on Exhibit No. 11. The Court's belief that the defendant Aiken requested an attorney on possibly two occasions is based upon having heard Exhibit No. 11 played several times on the original tape machine and a new tape recorder. Many of the defendant's answers were on the threshold of intelligibility. With the difficult time the Court and counsel have had in trying to hear what the defendant Aiken said, the Court does not believe that the interrogating officers heard, nor could possibly under all the circumstances have heard, any request for an attorney or desire to remain silent.

Aiken contends it is obvious from the continuity of questions and answers that the interrogators were listening and heard Aiken's requests for an attorney, especially consider-

ing the expression and tone of voice of the interrogator after Aiken's second attempt to exercise his privilege.

■ This factual determination was peculiarly a matter for the trial court to consider and having resolved this argument adversely to the defendant, we cannot now retry questions of fact involving substitution of our judgment for that of the trial court, where the finding attacked is based upon conflicting evidence. *Haynes v. Washington,* 373 U.S. 503, 515, 516, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963). The trial court chose to believe the several officers who testified that if such a request were made, it was unintelligible and not heard by them, and we have carefully reviewed this factual determination. We are satisfied that its findings are in no way distorted and are fully supported by the record and therefore hold that the trial court properly found that Aiken made at least two requests for an attorney; but that such requests, when made, were, in fact, unintelligible and not heard by the officers interrogating him.

The state contends that irrespective of the uncommunicated requests or desire of Aiken to have counsel or remain silent, these rights were knowingly and intelligently waived prior to giving his confessions, by his conduct, observable demeanor and articulations.

The trial court had no difficulty in finding that any requests by Aiken for an attorney or any desire on his part to remain silent were later waived after his confrontation with the defendant Wheat. Aiken does not assign error to or dispute any of the facts relied on by the trial court in finding waiver; but he does contend that this conclusion, under the circumstances, was improperly entered as a matter of law. To better understand the reasoning of the court, we have set out its conclusions as follows:

CONCLUSIONS AS TO THE VOLUNTARY NATURE
OF AIKEN'S ADMISSIONS AND CONFESSIONS.

As heretofore stated, any requests for an attorney or desire to remain silent by defendant Aiken were inaudible and unintelligible to the interrogating officers. Notwithstanding said requests the defendant Aiken by his

observable demeanor and actions knowingly and intentionally waived his right to counsel flowing from such requests, and his oral and written statements were given freely and voluntarily. The Court bases this conclusion upon the following findings and reasons:

a. That the defendant Wheat personally verified his statement (Exhibit No. 3) concerning the Wolf homicide at the request of the defendant Aiken. *It was this verification and the desire to refute Wheat's statement that caused the defendant Aiken to tell his side of the story as set forth in Exhibit Nos. 5, 7 and 14;* (Italics ours.)

b. That within five minutes after the confrontation between Wheat and Aiken, defendant Aiken was again advised of his right to counsel and that anything he did say could be used against him in a court of law. Understanding these rights, he clearly showed a desire to give a statement. He then proceeded to give an oral statement concerning not only one but the three homicides;

c. That prior to the confrontation the defendant Aiken was sullen, quiet and withdrawn. Immediately thereafter his attitude was positive and he became alert. He spoke clearly and he appeared to be upset or angry with the defendant Wheat;

d. That the defendant Aiken was advised at least three times prior to the beginning of Exhibit No. 12 and the signing of Exhibit No. 5 that he had a right to counsel, that he had a right to remain silent, and that anything he said could be used against him in a court of law. In addition, he was advised of his rights under Article 31 of the Uniform Code of Military Justice. As demonstrated by his testimony during the original pretrial hearing, the defendant Aiken is not dumb or illiterate by any means or standards. He is not a Danny Escobedo, who was an illiterate. He has a high school education and has been trained in the military. *He was well aware of these rights which had been explained to him prior to and throughout the interrogation, and knew that he did not need to answer any questions after the confrontation with the defendant Wheat.* (Italics ours.)

e. That prior to the signing of Exhibit No. 7 the defendant Aiken was again advised of his right to an

attorney, to remain silent, and that anything he said could be used against him in a court of law. On this occasion he was offered the opportunity to use a telephone and declined such use. While aware of his rights he proceeded to sign Exhibit No. 7 without any hesitation and without any request for assistance from anyone;

f. That defendant Aiken was given another opportunity to request counsel at 10:00 A.M. on April 26, 1965. At that time Sergeant Schoener and former Detective Dana Shearn advised him of his right to remain silent, his right to counsel, and the fact that anything he said could be used against him in a court of law. Again defendant Aiken proceeded to give a statement concerning the Wolf homicide and to draw a sketch of the homicide scene, demonstrating his knowledge of the area. It is to be noted that the interrogating officers, Sergeant Schoener and former Detective Shearn, were not present in the King County Courthouse prior to 9:00 A.M. on April 26, 1965, when the defendant Aiken signed Exhibits Nos. 5 and 7. They could not have possibly known of any request for counsel by the defendant Aiken;

g. That *the Court believes the testimony of the several officers who stated that they did not at any time hear the defendant Aiken make a request for an attorney, to make a phone call, or express a desire to remain silent. That the Court believes that if such requests were made or attempted to be made by defendant Aiken, such requests were inaudible and unintelligible to such officers.* That the Court further concludes that all statements made by defendant Aiken were freely and voluntarily given after having been fully and amply advised of his constitutional rights to an attorney and to remain silent. (Italics ours.)

Aiken argues there could be no knowing and intelligent waiver under these circumstances; since he believed the police officers did hear his requests for an attorney, and could only conclude that by not receiving one, his requests had been ignored; that as a result, his later incriminations were not admissible in evidence as involuntarily given due

to police threats that he would be charged on every single count if he didn't cooperate.

■ If Aiken's attempts to exercise his constitutional rights were frustrated by improper police tactics in ignoring his requests or by duress, we would agree with the defendant that his statements should not have been received in evidence for consideration by the jury. The constitution enjoins all unfair interrogation practices which are likely to exert such pressures upon an individual so as to disable him from making a free and rational choice whether to speak to the police. See *Miranda, supra,* at 460; *Escobedo v. Illinois, supra; Malloy v. Hogan,* 378 U.S. 1, 12 L. Ed. 2d 653, 84 Sup. Ct. 1489 (1964). See also *State v. Kelter,* 71 Wn.2d 52, 426 P.2d 500 (1967).

But the record from both hearings in the present case does not support the defendant's argument. In addition to finding that Aiken's requests were unintelligible, the trial court expressly found that his admissions and confessions were not occasioned by any promises, threats or statements made to him by any of the questioning officers, but that he gave them solely to refute Wheat's accusations. The police officers, therefore, not hearing Aiken's requests for legal assistance or desire to remain silent, and unable to act on a word or statement they did not hear, did not coerce the defendant into making his admissions and confessions, or exert such pressure on him that he was unable to make a free and rational choice whether to speak to the police. *Malloy, id.* at 7.

We agree with the trial court that it was not a compelling atmosphere of an in-custody interrogation that caused Aiken to speak; but an independent decision on his part to refrain from further exercising his right to silence without the advice of counsel, when the self-inspired confrontation with Wheat failed in its purpose of bringing about a repudiation of Wheat's accusation that he (Aiken) was responsible for the slaying of Daniel Wolf. The trial court properly concluded on undisputed facts that Aiken thereafter freely and voluntarily gave his three written statements admitting complicity and accusing Wheat of the murders.

We hold that Aiken's abdication of his constitutional privilege to remain silent—the choice on his part to speak to police without counsel, was made knowingly and intelligently after he had been apprised of his rights and admittedly understood that he had the right to consult with an attorney before incriminating himself.

The defendant argues, however, that there could be no knowing and intelligent waiver of any of his constitutional rights; since he was not effectively warned, and consequently could not know, that his admission of complicity in the crimes would expose him to charges of murder and the possible death penalty, just as if he had fired the fatal bullets.

The record discloses Aiken was informed by the police before any interrogation took place that the charges he faced were murder and robbery, and there is no clear and conclusive evidence that would indicate that the defendant was misinformed, in any respect, concerning the gravity of his offense or punishment he might receive should he be found guilty.

The further finding of the trial court was that the defendant had been effectively warned at least five times orally and fully understood from his previous experiences that any incriminations he made could be used against him in a court of law.

Considering these facts, we hold, as we have with the defendant Wheat, that a defendant, so warned, is put on notice of the very situation complained of. Aiken, understanding that anything he said could be used as evidence against him in court, may not now complain he incriminated himself out of ignorances of the law. See pp. 328, 329.

Aiken contends that regardless of the findings and conclusions reached by the trial court at the supplemental hearing, he has the right, at this time, to present to a jury at a new trial all of the now available evidence bearing on the issue of the voluntariness of his confessions. The defendant's argument, that he has such a right, is bottomed on our recent decision in *State v. Collins*, 69 Wn.2d 627, 419

P.2d 590 (1966), wherein we held, with respect to RPPP 101.20W, *supra*, that a defendant "may present to the jury de novo all of the detailed facts connected with the giving of the confession upon which an assertion of involuntariness may be claimed to depend, and if the jury believes the confession to be involuntary, they may disregard it."

 This rule goes further than the *minimum* federal standards of due process required for testing the voluntariness of confessions. In *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 Sup. Ct. 1774 (1964), the United States Supreme Court held that this determination by a jury is constitutionally inadequate by reason of the risk of its confusing the truth of the confession with its voluntariness; that to insure reliable results a pretrial evidentiary hearing is required; and that thereafter redetermination of the issue by the jury, while not improper, is not necessary. 378 U.S. at 380, 385. The court concluded that a new trial wasn't necessary where the jury alone had passed on the voluntariness of Jackson's confession and remanded the case for an evidentiary hearing exclusively before the state trial court. The court stated:

> At the very least, *Townsend v. Sain*, 372 U.S. 293, would require a full evidentiary hearing to determine the factual context in which Jackson's confession was given.
>
> . . . .
>
> It does not follow, however, that Jackson is automatically entitled to a complete new trial including a retrial of the issue of guilt or innocence. . . . [I]f at the conclusion of such an evidentiary hearing in the state court on the coercion issue, it is determined that Jackson's confession was voluntarily given, admissible in evidence, and properly to be considered by the jury, we see no constitutional necessity at that point for proceeding with a new trial, for Jackson has already been tried by a jury with the confession placed before it and has been found guilty. True, the jury in the first trial was permitted to deal with the issue of voluntariness and we do not know whether the conviction rested upon the confession; but if it did, there is no constitutional prejudice to Jackson from the New York procedure if the confession is now properly found to be voluntary and therefore admissible.

If the jury relied upon it, it was entitled to do so. Of course, if the state court, at an evidentiary hearing, redetermines the facts and decides that Jackson's confession was involuntary, there must be a new trial on guilt or innocence without the confession's being admitted in evidence.

The rule announced above applies with equal force to claims of involuntariness based on new evidence. *Townsend v. Sain,* 372 U.S. 293, 9 L. Ed. 2d 770, 83 Sup. Ct. 745 (1963).

We therefore hold that the evidentiary hearing before the trial judge alone on the issue of voluntariness of Aiken's confessions was sufficient to meet the *minimum* requirements of due process under the federal constitutional standards.

■ However, under our state procedure, RPPP 101.20W, *supra, State v. Collins, supra,* if the trial court has found the confession to be voluntary as a matter of law, and admissibility is not precluded by an exclusionary rule affecting the defendant's procedural safeguards, *Escobedo, supra; Massiah, supra,* the jury may redetermine the question of voluntariness as a matter of fact, as it relates to the weight and credibility to be given the confession. The jury may not, however, disregard a confession by measuring it against the foregoing legal tests of due process and reject the confession, as a judge would, if the tests are not fulfilled. See 3 Wigmore on Evidence, § 861, p. 347 (Supp. 1964 at 135).

In the present case the jury, after assessing the weight and credibility of the confessions at the trial, has already found that they were voluntarily given; and we are satisfied that the legitimate effect of the new evidence would not change this determination; since the defendant, as a matter of law, waived his constitutional rights before making the challenged statements.

We have heretofore held from the trial court's undisputed findings, that what really caused Aiken to admit his complicity in the slayings, was not the alleged denial of his constitutional rights by interrogating officers; but was an

independent decision on his part, after the face-to-face confrontation with Wheat, to proceed without counsel and make a statement rebutting Wheat's accusation of him as the triggerman in the Wolf slaying.

In the face of these findings, reasonable minds could not differ in concluding that the weight and credibility of Aiken's confessions were not affected by the alleged earlier denial of his procedural safeguards.

We hold, therefore, that reconsideration of the evidence by the jury at this time is not necessitated, and that the defendant Aiken is not denied due process by this determination.

Aiken contends the trial court erred in failing to grant him a reasonable opportunity to review the tape recording; that by only allowing the tape to be played once during the course of trial in a crowded courtroom, the requests for counsel were not appreciated by the defendant or his attorneys.

The record shows that after motions to produce were made by the defendant, the trial court ordered the tapes be impounded and placed in the possession of the court reporter, as an impartial party. Due to their unintelligibility the trial court had the court reporter transcribe the recordings and make copies available for the convenience of counsel. This was a proper precautionary measure followed by the trial court for the preservation of this important evidence.

The record further shows copies of the transcription were given to counsel and in addition the court allowed the playing of the tapes in open court during the pretrial hearing. The procedure followed by the trial court in the production and presentation of these tapes in evidence was within the trial court's discretion. *State v. Thompson,* 54 Wn.2d 100, 338 P.2d 319 (1959); *State v. Robinson,* 61 Wn.2d 107, 377 P.2d 248 (1962); *State v. Mesaros,* 62 Wn.2d 579, 384 P.2d 372 (1963); *State v. Gilman,* 63 Wn.2d 7, 385 P.2d 369 (1963); and *State v. Peele,* 67 Wn.2d 893, 410 P.2d 599 (1966). Considering the measures taken by the trial

court, and *the failure of counsel after the playing of the tape, to request a second playing or any other measure to aid in deciphering the unintelligible portions,* we do not find this procedure followed by the trial court to be an abuse of discretion.

### Remaining Assignments Of Error

Defendant Aiken contends that the standards for voluntariness of admissions or confessions contained in the court's instruction No. 24 were incorrect, and that the instruction was erroneously given. We disagree. The instruction adequately advised the jury that confessions and admissions, in order to be considered reliable, must be freely and voluntarily given and not caused by duress or fear produced by threats. This is particularly spelled out when instruction No. 24 is considered in connection with the following special interrogatories which were answered by the jury:

*Interrogatory No. 1:*

Were any of the alleged oral or written admissions or confessions made by defendant Aiken caused by duress or fear produced by threats?

Answer: *No* (Yes or No)

*Interrogatory No. 2:*

Were any of said alleged admissions or confessions made by defendant Aiken obtained by means of inducements or promises?

Answer: *No* (Yes or No)

*Interrogatory No. 3:*

Were all of said alleged admissions or confessions freely and voluntarily made by defendant Aiken?

Answer: *Yes* (Yes or No)

*Interrogatory No. 4:*

In arriving at your verdict did you consider said alleged admissions or confessions?

Answer: *Yes* (Yes or No)

■ Wheat and Aiken both contend the trial court erred in denying their motions for a change of venue by reason of

prejudicial pretrial publicity. We disagree. The record indicates that the news media exercised remarkable restraint to avoid prejudicing the right of the defendants to a fair trial by reason of pretrial publicity. We find nothing in the record as to the publication of incriminating statements made by the defendants that were disclosed prior to trial when motions for separate trials were interposed, and when applications for review of the order denying the motions were made to this court, which could have then been published. We are satisfied that the defendants were not denied a fair trial by reason of the pretrial publicity, and that the motions for change of venue were properly denied.

Wheat and Aiken both contend the court erred in denying their motions for separate trials; that a fair trial could not be obtained if they were tried jointly, as in this case the confessions of one involved the other; and that they were accusing each other of the commission of the crimes.

The rule is well established that the granting or denial of such a motion is within the discretion of the trial court, and will not be disturbed in the absence of a manifest abuse of discretion. RCW 10.46.100; *State v. Baker,* 150 Wash. 82, 272 Pac. 80 (1928); *State v. Courville,* 63 Wn.2d 498, 387 P.2d 938 (1963). The trial court stated in its ruling denying the motions:

it appearing . . . that if separate trials were granted the publicity resulting from the trial of the first defendant could highly prejudice the defendant subsequently tried; and if separate trials were granted, the state and military authorities would be required to keep numerous service personnel, endorsed as witnesses, within the jurisdiction for an extended period of time and that said retention could possibly interfere with military duties of said personnel; that except for the written statements of each of the defendants, a substantial portion of the evidence admissible against one defendant would probably be admissible against the other defendant; that most of the defendants' statements are substantially consistent with each other; that separate trials, if granted, would cause an unreasonable economic burden upon King County in that the court, lawyers, witnesses and jurors

would be required to participate in two long and expensive trials rather than one; . . . .

. . . .

That the granting of separate trials would cause the trial of one of the two defendants to be delayed an unreasonable length of time; that at the present time, the defendants have not made a showing as to whether their defenses at the time of trial will be antagonistic other than the special plea of insanity by defendant Wheat and the contradictory portions of defendants' statements; that the court will instruct the jury, as often as it deems necessary, that they cannot consider as evidence against either one of the defendants the out of court statements of one codefendant made out of the presence and hearing of the other codefendant; that at this time the statements of the defendants have not been admitted into evidence; that the court does not know whether said statements are admissible; that when two defendants are accused of the same crime arising out of the same circumstances, the Washington Supreme Court and the United States Supreme Court have held that it is not an abuse of discretion to try them together, . . . .

The record shows the special plea of temporary insanity by defendant Wheat was withdrawn before trial. It further shows that on 12 separate occasions during the trial the jury was warned that the confessions and statements made by the defendants were to be considered only against the person making the statements. The trial court did not abuse its discretion in denying the motions for separate trials. See *Delli Paoli v. United States,* 352 U.S. 232, 1 L. Ed. 2d 278, 77 Sup. Ct. 294 (1957).

Aiken contends that the court erred in denying his motion for dismissal of count 3, with which he was charged in the information. This count related to the James Harp homicide, in which the defendant contends he was asleep in Wheat's car when the crime was being committed. A review of the record shows the following:

The defendants were together from early Friday evening, on April 23, 1965, until dawn the next morning after the murder. Aiken stated that Wheat suggested they "hit" the Douglas station. Aiken knew Wheat left the car to go into

the station. Aiken knew how James Harp was dressed. Aiken was in a position to observe all entrances to the service station. He was armed with a .25 caliber automatic pistol. Aiken's .22 caliber pistol was used to kill James Harp. Aiken participated with Wheat in two prior robberies of service stations and murders of their attendants. The pattern followed in those instances was very similar to the robbery of the Douglas Service Station and the James Harp homicide. The jury was entitled to disbelieve the statements of Aiken that he was asleep and did not participate. There was ample evidence in the record which, if believed by the jury, together with the reasonable inferences to be drawn therefrom, would justify the jury in finding Aiken was an accomplice in the robbery of the Douglas Service Station and the Harp homicide.

Aiken further contends it was prejudicial to him to introduce photographs of Harp and repair claim checks regarding Harp's wristwatch. These contended errors are without merit. They were material to evidence of the robbery and the Harp homicide, to which the jury was entitled to find that Aiken was an accomplice.

Aiken contends the court erred in giving instruction No. 14 defining aiding and abetting, in that it could be inferred that the presence of a person at the scene of the crime, even if asleep, would be sufficient to sustain a conviction. RCW 9.01.030 defines a principal as including one who aids or abets the commission of an offense, who may be present or absent at the scene of the crime. The instruction spells out that in order for a person to be an aider or abettor by his presence, he must be ready to assist or must assist the perpetrator of the crime by his presence. Instruction No. 14 is a correct statement of the law in conformity with the statute, *supra,* and was properly given. *State v. Clark,* 26 Wn.2d 160, 173 P.2d 189 (1946). *State v. Redden,* 71 Wn.2d 147, 426 P.2d 854 (1967).

Wheat contends that the court erred in failing to grant seven of his challenges for cause in his voir dire examination of veniremen in the selection of the jury, and

that he was thereby required to exercise his peremptory challenges. There can be no prejudicial error resulting therefrom since the defendants were allowed 12 additional peremptory challenges not provided by statute. Moreover, there was no objection made to the court's denial of Wheat's challenges for cause after his peremptory challenges had been exhausted, except in the case of juror Symington. This juror indicated that he was in favor of the death penalty by reason of criminals being turned loose by the courts. The juror ultimately stated, in regard to imposing the death penalty, that he ". . . would give every consideration before I would reach that decision," and that he ". . . would be impartial." The granting or denial of a challenge for cause is within the discretion of the trial judge, and will not constitute reversible error in the absence of a manifest abuse of discretion. We see no manifest abuse of discretion in this instance.

 Wheat further contends, however, that it was improper for the trial court to make inquiry into the juror's qualifications which constituted a comment on the evidence. The inquiry of the trial court went only to the ability of the veniremen to serve as fair and impartial jurors and was proper.

Wheat contends the court erred in excusing 18 veniremen for cause who indicated they were not in favor of the death penalty. This contention is without merit. No venireman should be permitted to serve as a juror unless he is willing to apply the laws of this state to a proper case. The defendant's contention is contrary to the express provisions of RCW 10.49.050:

> Challenge for cause—Capital case—Conscientious scruples. No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense.

Also see *State v. Mahoney,* 120 Wash. 633, 208 Pac. 37 (1922); *State v. Riley,* 126 Wash. 256, 218 Pac. 238 (1923); *State v. Leuch,* 198 Wash. 331, 88 P.2d 440 (1939).

Wheat contends it was error to seat 12 veniremen prior to the beginning of questions. This contention is without merit. This goes only to the procedure of examination of the veniremen on their qualifications as jurors. We see no rights of the defendant's participation in the selection of the jury denied by this procedure.

Wheat contends the prosecuting attorney committed misconduct in his opening statement, in detailing the manner in which the shots were fired at the time one of the victims was attempting to rise from the floor; that this was highly inflammatory and prejudicial, resulting in a denial of a fair trial to the defendants.

■ The record shows that these statements were prefaced with the warning that they were not evidence but an outline of what the state intended to prove at the trial. The prosecuting attorney was entitled to make such statements as long as they were supported by evidence or reasonable inferences therefrom, and were material to the issues of the case. The record discloses that evidence was introduced which, with the reasonable inferences therefrom, supported these statements by the prosecutor. They were relevant to show the viciousness and callousness of the killings for the jury's consideration of the degree of punishment to be imposed, in the event of a finding of the defendants' guilt.

■ Defendant Wheat contends the trial court erred in failing to permit two expert witnesses to give testimony to the jury concerning rehabilitation of persons convicted of first-degree murder. The record shows these witnesses had never interviewed the defendants in this case. The materiality of their testimony, if any, and the qualifications of the purported experts were matters for the trial court to determine in the exercise of its discretion. We find no abuse of its discretion in this regard.

Aiken and Wheat both contend the trial court erred in failing to suppress the introduction in evidence of the .22 caliber revolver seized upon the search of Wheat's duffel bag, on grounds that it was the fruit of an unlawful search and seizure. The trial court after hearing extended testi-

mony on this issue in the pretrial hearing concluded in an undisputed finding that the search was voluntarily consented to by Wheat, and that there was, therefore, no unlawful seizure of the revolver. The trial court did not err in admitting this evidence. *State v. Johnson,* 71 Wn.2d 239, 427 P.2d 705 (1967).

Wheat contends the court erred in refusing to permit Aiken's attorney, Anthony Savage, Jr., to give testimony as to Wheat's emotional state, as disclosed by statements of Airman Milton Johnson, at the time of his detention at Paine Field. This constituted hearsay testimony and was inadmissible. The ruling of the trial court was correct.

Wheat asserts the trial court erred in permitting the FBI ballistics expert to testify that spent cartridges found at the homicides were ejected from Aiken's revolver, contending that they were not traced as to (1) the persons handling them through the different agencies while the tests were made; (2) that the evidence was hearsay as the defendant was not present when the tests were made; and (3) the conditions under which the tests were made were not under conditions corresponding to those present when the shots were fired. These contentions go primarily to the sufficiency of the evidence. We find evidence to support the trial court's determination of the adequate identification of the spent cartridges, and that the tests were under the direction of the expert who was qualified to give his opinion for the jury's consideration. As to the contention of hearsay, in that the tests were not a part of the trial, the expert having once been qualified was entitled to relate the test conducted and express his opinion in relation thereto. The jury had the right to give the expert testimony the weight to which it believed it was entitled, upon which the jury was adequately instructed. See *State v. Leuch, supra; State v. Gruber,* 150 Wash. 66, 272 Pac. 89 (1928).

Wheat contends a GT-1 automobile battery was erroneously introduced in evidence as it was not sufficiently identified. This contention is without merit. The evidence shows it was a GT-1 battery of the type missing from the

inventory of the Time Oil Service Station, which was checked 3 days before the robbery, and which was afterwards found in the defendant's car. The assigned error goes to the weight of the evidence rather than to the admissibility. *State v. Duree*, 52 Wn.2d 324, 324 P.2d 1074 (1958).

■ Wheat contends the trial court erred in refusing to instruct the jury on the offense of second-degree murder. There is no evidence to support second-degree murder in the record. The defendants were guilty or not guilty of first-degree murder only.

Defendant Aiken contends the trial court erred in not granting him a new trial on the basis of the statement made by the prosecuting attorney in his argument to the jury relative to Aiken's purchase and possession of a .25 caliber revolver; and that there was no evidence to justify such comments. We need not detail the comments and the evidence. Our examination of the record discloses there were reasonable inferences that could be drawn from the evidence to justify such comments.

■ Finally, it is contended by Wheat that the trial court erred in requiring him, before addressing the jury, to put in writing his unsworn statement and not to go beyond that statement. We find no error in this procedure. It is within the discretion of the trial court to allow a defendant represented by counsel to make a separate address to the jury. See *People v. Richardson*, 4 N.Y.2d 224, 149 N.E.2d 875 (1958). (Const. art. 1, § 22, (amendment 10)) The trial court, mindful that Wheat had not taken the witness stand in his own defense, correctly advised him that in making his own statement to the jury, he would be open to cross-examination if he discussed facts not covered by the evidence in the case. As the defendant was allowed to make his statement to the jury, subject only to this limitation, we see no error.

We are satisfied that both defendants Wheat and Aiken received a fair trial. The judgments and sentences entered upon the jury verdicts are affirmed.

FINLEY, C. J., HILL, ROSELLINI, and HALE, JJ., concur.

DONWORTH, J. (dissenting)—I cannot agree with the majority opinion in these two cases because, after an exhaustive examination of the voluminous record and briefs, I am convinced that both defendants were denied rights guaranteed them by the fifth and sixth amendments to the United States Constitution as construed and applied by the United States Supreme Court in recent decisions.

Before stating my reasons for dissenting, I think it appropriate to quote the definition of a fair and impartial trial which this court has approved on several occasions. It is stated in *State v. Lindsey*, 27 Wn.2d 186, 191, 177 P.2d 387 (1947), as follows:

> Judge Mitchell stated, in the case of *State v. Devlin, supra* [145 Wash. 44, 258 Pac. 826]:
>
> "The question involved is that of a fair and impartial trial. In *State v. Pryor*, 67 Wash. 216, 121 Pac. 56, this court said:
>
> " 'A fair trial consists not alone in an observation of the naked forms of law, but in a recognition and a just application of its principles.'
>
> "It is the law of the land, a right vouchsafed by the direct written law of the people of the state. It partakes of the character of fair play which pervades all the activities of the American people, whether in their sports, business, society, religion or the law. In the maintenance of government to the extent it is committed to the courts and lawyers in the administration of the criminal law, *it is just as essential that one accused of crime shall have a fair trial as it is that he be tried at all, whether he be guilty or not,* has his picture in the rogue's gallery or not. . . . " (Italics mine.)

That case was heard again en banc and a majority of the court adhered to the departmental opinion.

In my opinion neither of these defendants had a fair trial, and hence each of them is entitled to a new trial. I shall discuss each case separately.

## APPELLANT AIKEN

Lest one be led to believe that the effects of this case will die with the accused, since future cases will be governed by

the more stringent rules set forth by the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 Sup. Ct. 1602 (1966), while these appellants must be judged under the criterion of *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 Sup. Ct. 1758 (1964), it should be stressed that the central issue here is waiver of a constitutional right. The rules set forth governing that important principle will remain and will control future cases in this state, even under *Miranda* standards. It is largely the violence done to that concept by the majority opinion in this case that compels my dissent. It is my firm belief that no single conviction of an accused is worth the harm that may be done by this ruling. Constitutional safeguards must not be sacrificed upon the altar of expediency. It must be remembered that:

> [U]nfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained, is unjust and dangerous to the whole community. *Hurd v. The People,* 25 Mich. 405, 416 (1872).

Until today, I had always thought it too apparent to require explication that "waiver" of a constitutional right by an accused required either some voluntary affirmative expression in word or in deed by the accused, or at least a voluntary and knowing acquiescence in the loss of that right by him. *Miranda v. Arizona, supra; Escobedo v. Illinois, supra; Brookhart v. Janis,* 384 U.S. 1, 16 L. Ed. 2d 314, 86 Sup. Ct. 1245 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 82 L. Ed. 1461, 58 Sup. Ct. 1019, 146 A.L.R. 357 (1938); *Carnley v. Cochran,* 369 U.S. 506, 8 L. Ed. 2d 70, 82 Sup. Ct. 884 (1962). See, also, *Glasser v. United States,* 315 U.S. 60, 86 L. Ed. 680, 62 Sup. Ct. 457 (1942).

But, by the majority opinion in this case, it is held sufficient if interrogators "do not hear" the accused's attempt to assert the right which he has previously been told he has, and he thereafter, in desperation, attempts to remove the finger of guilt from himself by seeking to have his accuser retract his accusation; and, having failed in this attempt, finally confesses his guilt.

Let no mistake be made here—appellant Aiken did not acquiesce; *he succumbed!*

It is indisputable that even fundamental constitutional rights may be waived by the accused. *Escobedo v. Illinois, supra.* However, the question of a waiver of a federally guaranteed constitutional right is a federal question, controlled by federal law. *Brookhart v. Janis, supra.*

Under federal law, there is a strong presumption against the waiver of fundamental constitutional rights, and, for a waiver to be effective, it must be clearly established that there was "an *intentional relinquishment* or abandonment of a known right or privilege." *Johnson v. Zerbst, supra* at 464. (Italics mine.)

The foregoing principles were reiterated and given concrete application by the United States Supreme Court in *Miranda v. Arizona, supra* at 475:

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois,* 378 U. S. 478, 490, n. 14. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst,* 304 U. S. 458 (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in *Carnley v. Cochran,* 369 U. S. 506, 516 (1962), is applicable here:

>> "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was

offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

See also *Glasser v. United States,* 315 U. S. 60 (1942).

It is obvious, therefore, that the fact that Aiken eventually give a statement following an intensive interrogation cannot constitute a waiver of the rights that he had unsuccessfully attempted to exercise some minutes earlier in the same interrogation, even though the required "warnings" have been given.

Nor can the fact that appellant Aiken requested the confrontation with Wheat be rationally construed to be a waiver of the right he had just attempted to assert without success. To so hold, one must close his eyes to the facts of the interrogation.[1]

Aiken had been shown Wheat's statement accusing him (Aiken) of having been the "triggerman" in the killing of Daniel Wolf. The interrogating officers told Aiken that the statement was corroborated by the physical evidence, and that the only way he could "help himself" was to "tell the truth." Aiken, apparently seeing the hopelessness of his situation, requested the assistance of counsel, and the requests went unheeded.

When Aiken expressed his desire to discontinue the interrogation, he was told that if he did not "cooperate" he would be charged "on every single count." In other words, Aiken would be charged with three first-degree murders instead of one. The only conceivable avenue of escape for Aiken short of confessing, was to attempt to get Wheat to retract his accusing statement, and this is what Aiken tried to do. To interpret this action as a knowing and intelligent voluntary waiver of his expressly requested right to counsel seems to me to fly in the face of reason.

When Wheat refused to retract his statement, Aiken's "breaking" *as the result of this entire chain of circum-*

---

[1] The written transcript of Aiken's interrogation, made by the court reporter from the tape recording admitted in evidence as exhibit 11, is included in this dissent as an appendix. Although incomplete, it illustrates the compelling atmosphere in which Aiken's confessions were taken from him. A full appreciation of Aiken's predicament, however, can be gained only from hearing the recording itself.

*stances,*[2] was almost inevitable. As the United States Supreme Court pointed out in *Escobedo v. Illinois, supra* at 485:

> "It cannot be doubted that, placed in the position in which the accused was when the statement was made to him that the other suspected person had charged him with crime, the result was to produce upon his mind the fear that if he remained silent it would be considered an admission of guilt, and therefore render certain his being committed for trial as the guilty person, and it cannot be conceived that the converse impression would not also have naturally arisen, that by denying there was hope of removing the suspicion from himself."[3]

---

[2] I think it idle to speculate as to which of several coercive elements of an incommunicado interrogation "result" in the confession. The confrontation with Wheat and the failure of Aiken's attempt to get Wheat to retract his statements may have been the "straw that broke the camel's back," but its effect cannot be considered apart from the circumstances in which it occurred.

[3] This case contains yet another element in common with *Escobedo,* the ignorance on the part of the accused of the consequences of his admission of participation in the robberies. In *Escobedo, supra* at 486, the United States Supreme Court pointed out that: "Petitioner, a layman, was undoubtedly unaware that under Illinois law an admission of 'mere' complicity in the murder plot was legally as damaging as an admission of firing of the fatal shots. *Illinois v. Escobedo,* 28 Ill.2d 41, 190 N.E.2d 825. The 'guiding hand of counsel' was essential to advise petitioner of his rights in this delicate situation. *Powell v. Alabama,* 287 U. S. 45, 69."

Here, in addition to this presumption, there existed what I can only interpret as deliberate misleading of the interrogated Aiken on this point. During the interrogation, after Aiken had been shown the statement by Wheat accusing him (Aiken) of the actual shooting of Wolf, and *after Aiken's repeated requests for counsel had gone unheeded,* an officer told Aiken: "Now, you haven't had a chance to give your side of it. *Maybe you were just along and Wheat did the* killing. We don't know this. Everything right now is pointing it right on you, and these are very serious charges, homicide and murder. *If Wheat is lying about the statements, that you didn't kill him, if Wheat killed him, we want to know it* . . . . statements to that effect . . . along with these statements, but we certainly want to listen to your side . . . charging with murder . . . not until you have a chance to tell us." (Italics mine.)

In my opinion, such a statement, made to this lay defendant under all these attendant circumstances, can bear but one interpretation in the mind of that defendant—that the admission of implication in the

It must be concluded, therefore, that neither the fact that Aiken did eventually confess participation in one or more of the crimes, nor the requested confrontation with Wheat, even though both occurred after Aiken had been told he had a right to counsel, can reasonably be interpreted as waiver of that right under the circumstances presented.

Central to the majority's thesis of "waiver" is the finding of the trial court that Aiken's interrogators did not "hear" appellant Aiken's repeated requests for counsel. This finding, which is challenged by appellant Aiken on this appeal and which is set forth verbatim in the majority opinion at page 336, was based on several factors which may be summarized as follows: (1) the officers *said* they did not hear any requests;[4] (2) Aiken was a soft-spoken individual; (3) the "interview" room was not soundproof and outside noises interfered with communication; (4) the interrogators did not sit "next to" appellant Aiken;[5] (5) Aiken was difficult to understand on the tape recording of the interrogation.[6]

---

robbery alone is not an admission of guilt of first-degree murder—and that participation in the robbery is a separate offense, legally, from participation in the homicide. The officer knew better. I deem such deliberate misleading of the defendant wholly impermissible.

[4]The trial court also noted in this regard that "if they [the officers] had heard an audible or intelligent [*sic*] request or a desire to remain silent, the interrogation would have stopped." This kind of speculation as to what would have been done "if" has no place in a trial court's findings of fact.

[5]Highly significant, but overlooked by the majority, is the finding of the trial court that "defendant Aiken was not close to the microphone," which, nevertheless, picked up his spoken request for counsel.

[6]Even casual acquaintance with the mechanics of recording shows that this fact has no probative value in determining the intelligibility to others in the room where the recording was made. Our own experience with oral arguments before this court serves as apt illustration. All oral arguments before this court are recorded on magnetic tape. Counsel, standing at the podium before the court can be clearly heard by the members of the court sitting at the bench. He can also be "heard" by the microphone which is placed immediately in front of him. However, when he steps to the exhibit board, though he can still be clearly heard by the members of this court, he can no longer be "heard" by the microphone. Upon replay of this tape in chambers, counsel's voice,

However, the argument overlooks the fact that our concern here is with "waiver" of the right to counsel to which Aiken was indisputably entitled at the time.

Whatever else it may be, waiver is an *intentional* relinquishment or abandonment, and the necessary intention is that of the accused. No act or failure to act on the part of his interrogators can conceivably be construed to have been an intentional waiver on the part of Aiken.

Therefore, if waiver by Aiken is to be found in this circumstance (failure of the interrogating officers to "hear"), it must logically be based on Aiken's knowing failure to successfully communicate his desires to his interrogators.

But such a knowing failure is not even alleged in this case, nor are there facts in the record which could reasonably support such an allegation had it been made.[7]

In *Townsend v. Sain,* 372 U.S. 293, 9 L. Ed. 2d 770, 83 Sup. Ct. 745 (1963), which involved a purportedly "drug induced" confession, the United States Supreme Court stated, at page 308, the applicable principle:

> It is not significant that the drug may have been administered and the questions asked by persons unfamiliar with hyoscine's properties as a "truth serum," if these properties exist. Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible. The Court has usually so stated the test. See, *e.g., Stroble v. California,* 343 U. S. 181, 190: "If the confession which petitioner made . . . was in fact involuntary, the conviction cannot stand . . . ." And in *Blackburn v. Alabama,* 361 U. S. 199, we held *irrelevant the absence of evidence of improper purpose on the part of the questioning officers.* (Italics mine.)

while he stood at the exhibit board, is inaudible, or barely audible. Following the trial court's analysis, one would have to conclude, though incorrectly, that the court could not hear that portion of counsel's argument.

[7] Aiken made his requests aloud, sufficiently so that a microphone, placed some feet away, picked up the request equally as well as it did many of his statements which were heard and responded to by his interrogators. He repeated his request for counsel at least twice, and his desire to terminate the interrogation at least once.

Therefore, the only pertinent inquiry relates to the effect on the interrogated Aiken of the failure of his interrogators to honor his repeated request for legal assistance or for an end to the interrogation. In this inquiry, it must be kept firmly in mind that *no reason existed for Aiken to believe that his repeated requests had not been heard.*

This being the case, I can perceive no distinction on the question of waiver between the circumstances existing here and those where the requests of the accused are heard and ignored. And clearly, nothing in this record can be deemed to have been a voluntary, knowing, and intelligent waiver by appellant Aiken.

Therefore, given Aiken's express request for the assistance of counsel and the effective denial of that right, I can conceive of no possible conclusion but that, under the existing law, Aiken's confessions must be excluded. I would reverse his conviction and remand for retrial absent the statements extracted from him as the result of this interrogation.[8]

---

[8]The majority lays great stress on the many times Aiken was *told* that he was entitled to the assistance of counsel. But such advice is no more than the *prerequisite* to waiver a "protective device to dispel the compelling atmosphere of the interrogation." *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 Sup. Ct. 1602. Waiver can only exist as to a *known* right, and until an accused is so advised, the right is deemed unknown to him and no waiver can occur.

But from the fact that this prerequisite to waiver exists, *i.e.,* the accused was "warned of the right," it does not follow that there was, in fact, waiver. Waiver, again, is the knowing relinquishment of the known right.

Additionally, I cannot conceive of the warnings given here, however often they were repeated, being characterized as "effective" as is required by the Supreme Court in *Escobedo.*

The purpose of the warnings is (1) to overcome the inherent pressures of the interrogating atmosphere, and (2) to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." *Miranda v. Arizona, supra.* And, of course, unless the latter purpose is fulfilled, the former cannot be. The warnings given in this case, followed by the effective denial of that very right which Aiken tried to exercise, fails in both respects. I cannot agree, therefore, that Aiken was ever "effectively" advised of either his right to counsel or his right to remain silent.

My next point of disagreement with the majority relates to appellant Aiken's contention that he is entitled, under RPPP 101.20W, to present to the jury the fact of his request for the assistance of counsel.

The argument of the majority on this point fails to make the fundamental distinction between *admissibility* of evidence and the *weight* to be accorded that evidence.

Rule of Pleading, Practice and Procedure 101.20W (d) provides, in part, that *after the trial court has held the threshold hearing regarding the admissibility of a challenged confession:*

> If the trial judge rules that the confession is admissible, and it is offered in evidence: (1) the defense may offer evidence, or cross-examine the witnesses, with respect to the circumstances surrounding the confession . . . .

and

> (4) if the defense raises the issue of voluntariness under (1) above, the jury shall be instructed that they may give such weight and credibility to the confession, in view of the surrounding circumstances, as they see fit.

In *State v. Collins,* 69 Wn.2d 627, 419 P.2d 590 (1966), this court stated that:

> [T]he defendant at all times is armed with a quintuple safeguard to prevent the use of a forced or false confession. (1) If he knows that he need not make a statement at all, he is free to confess or not; the choice remains with him. (2) If he knows of his right to consult counsel before answering any question, he probably will not allow his will to be overcome. (3) If he is assured of his right to remain silent and that anything he says may be used in evidence and also of his right to consult with counsel, he knows too that he cannot be subject to physical force or fear of violence. (4) The trial judge passes upon the confession and determines as a fact whether the confession was involuntary or freely and voluntarily given. (5) *The defendant may present to the jury de novo all of the detailed facts connected with the giving of the confession upon which an assertion of involuntariness may be claimed to depend, and if the jury believes the confession to be involuntary, they may disregard it.* (Italics mine.) (p. 636)

Even more recently, in *State v. Piche,* 71 Wn.2d 583, 588, 430 P.2d 522 (1967), this court said:

> If, from conflicting evidence as to the circumstances surrounding the taking or giving of the confession, the court finds the confession was voluntarily made, it becomes prima facie admissible. *State v. Streeter,* 67 Wn.2d 39, 406 P.2d 590 (1965); *State v. Gersvold,* 66 Wn.2d 900, 406 P.2d 318 (1965); and *State v. Darst,* 65 Wn.2d 808, 399 P.2d 618 (1965). *The defendant may, of course, submit anew the question of voluntariness to the jury.* (Italics mine.)

Yet the majority, after having so recently guaranteed this right to all criminally accused, concludes that *this* appellant is not entitled to this "safeguard." No attempt is made to explain how such a holding is compatible with the guarantee of equal protection under the fourteenth amendment to the United States Constitution. I doubt that such an argument could be legitimately made.

In my opinion, it is imperative that appellant Aiken be afforded this right. The weight given these confessions becomes of paramount importance in view of the fact that *the jury, and it alone, determines not only the fact of guilt or innocence, but also whether the punishment to be imposed shall be death. In re White v. Rhay,* 64 Wn.2d 15, 390 P.2d 535 (1964). RCW 9.48.030; RCW 10.49.010.

The statements involved in this case are essentially inflammatory in nature, going beyond the fact of the commission of the crime to the details of their commission. It may well be that the weight accorded these statements was crucial in the determination by the jury in rendering its verdict, and I think that it is impermissible to deny any criminally accused an adequate opportunity to present all evidence favorable to him bearing on the issues involved, and I further feel that this court cannot do so where such a right is guaranteed by RPPP 101.20W, *supra,* to all criminal defendants generally.

In this connection, the court instructed the jury, in instruction No. 24, that:

Admissions or confessions made by a defendant charged with crime, when such admissions or confessions are voluntarily given and not caused by duress or fear produced by threats, are to be considered by the jury in connection with all the other evidence in the case in determining the guilt or innocence of the accused, and their weight as evidence, like that of any other fact, is to be determined by you alone. If you find that any such admissions or confessions have been freely and voluntarily made in this case, you have a right, in weighing such testimony, to consider all the facts and circumstances connected therewith, together with the defendant's interest, if any, in the transaction, and his knowledge, if he had any, of the circumstances surrounding the same, and all other circumstances which may throw any light upon or aid you in weighing such testimony. If you find admissions or confessions were not made voluntarily, it is your duty to disregard the same.

The prosecutor, in final argument, stressed the lack of evidence of a request by Aiken, telling the jury that:

There has been no one, not one shred of evidence contradicting the fact that they [the officers] did warn them [appellants] of their rights.

Mr. Egger [counsel for appellant Aiken], in his argument says to you, did anyone say that the Defendant Aiken was warned of his rights, and, ladies and gentlemen, Mr. Egger *has not put forth any evidence contrary* to the evidence of Mr. Goff, Mr. Elsner, Mr. Seldomridge, Detective Leitch, Detective Chase, Detective Mullen, Detective Church, Detective Schoener, *all of whom said that the Defendant Aiken never requested counsel.*

*Mr. Egger would like you to believe that he did request counsel, only there has been no testimony relative to that; there has been no evidence relative to that.*

*You are to determine this case upon the evidence that you heard, and there is no reason to disbelieve these many, many officers who testified that he did not make such a request,* and that he was warned of all of his rights. (Italics mine.)

The jury, in response to interrogatories submitted to them, stated that they considered the confessions voluntary, and *did consider them in reaching their verdict.*

The majority's argument, based on *Jackson v. Denno*,[9] 378 U.S. 368, 12 L. Ed. 2d 908, 84 Sup. Ct. 1774 (1964), and *Townsend v. Sain, supra,* has no bearing on this issue since it concludes that the procedure required by Rule 101.20W meets the *minimum* federal standards as required by those cases. I must agree that it does. But no contention is made in this case, expressly or impliedly, that it does not. Appellant Aiken merely contends that he is entitled to the "safeguards" afforded him under this constitutionally valid rule, and with that contention I also agree.

The majority then cites 3 J. Wigmore, Evidence, § 861, p. 347, for the proposition that a jury may not disregard a confession by measuring it against the "foregoing" legal tests of due process and reject the confession as a judge would if the tests are not fulfilled.

In short, the jury may not determine the *admissibility* of a confession. Indeed, under *Jackson v. Denno, supra,* de-

---

[9]*Jackson v. Denno* involved a challenge to the constitutionality of the so-called "New York" confession rule under which, if there existed a factual conflict in the evidence as to voluntariness upon which reasonable men could differ, the judge left the question of voluntariness to the jury who determined the *admissibility* of the confession, as well as the guilt or innocence of the accused. The Supreme Court held that the disputed procedure denied the defendant due process of law. However, express approval was given in that case to the procedure followed in Washington, of giving the question to the jury *after* the threshold determination of legal admissibility was made by the court. In a footnote, the court said: "Once the confession is properly found to be voluntary by the judge, reconsideration of this issue by the jury does not, of course, improperly affect the jury's determination of the *credibility or probativeness* of the confession or its ultimate determination of guilt or innocence." (Itailcs mine.)

The majority quotes from *Jackson* to the effect that Jackson was not entitled to a complete new trial automatically, including a retrial of the issue of guilt or innocence. The reason was obvious in that case. No evidence was shown to exist which had not been before the jury in the first trial.

The majority in the case at bar states, without explanation, that "The rule . . . applies with equal force to claims of involuntariness based on new evidence." The citation to *Townsend v. Sain, supra,* is wholly inappropriate, that case having dealt only with the duty of a federal district court to hold an evidentiary hearing on petition for habeas corpus and concluding that, under the facts of that case (which included new evidence of a kind), such a hearing must be held.

cided subsequent to the quoted passage in Wigmore, the trial jury cannot constitutionally be made the determiner of the *admissibility* of a confession.

But the fact remains that the jury is the sole and exclusive determiner of the *weight* to be given evidence, including confessions. 3 J. Wigmore, Evidence, in § 861, quotes approvingly from *Burton v. State,* 107 Ala. 108, 18 So. 284 (1895), which stresses this very distinction:

"Whether voluntarily made or not, we hold, is a question of law, to be determined by the Court from the facts, as a condition precedent to their admission. Having been declared competent and admissible, they are before the jury for consideration. The jury have no authority to reject them as incompetent. *But the jury are the sole judges of the truth and weight to be given confessions, as they are of any other fact.* In weighing the confessions, the jury must take into consideration all the circumstances surrounding them, and under which they were made, including those under which the Court declared, as matter of law, they were voluntary. In weighing confessions, the jury necessarily consider those facts upon which their admissibility, as having been voluntarily made, depends. *While there is no power in the jury to reject the confessions, as being incompetent, there is no power in the Court to control the jury in the weight to be given to facts.* The jury may, therefore, in the exercise of their authority, and within their province, determine that the confessions are untrue, or not entitled to any weight, upon the grounds that they were not voluntarily made. The Court passes upon the facts merely for the purpose of determining their competency and admissibility. The jury pass upon the same facts, and in connection with other facts, if there are other facts, in determining whether the confessions are true, and entitled to any, and how much weight. The Court and jury each have a well-defined and separate province." (Italics mine.)

Thus the majority's quest is again fruitless, for Wigmore, to the extent that his text is applicable to the question presented at all, supports the rule followed in this state, Rule 101.20W (d). Again, that rule provides that *after* the court has passed on the admissibility of a confession in a threshold hearing, the accused then has the right to present

that evidence anew to the jury, which is to determine his guilt or innocence, and, in this case, *the penalty which shall be imposed upon his conviction.*

The majority finally attempts to justify their denial of this right to appellant Aiken on the ground that "reasonable minds could not differ in concluding that the weight and credibility of Aiken's confessions were not affected by the alleged earlier denial of his procedural safeguards."

In the apparent realization that such an argument requires more than the mere statement of the conclusion, the majority seek to bolster this stand by contending that the "new evidence" (the fact of Aiken's request for legal assistance) could not change the jury's determination because Aiken had, after his request, waived the right as a matter of law!

Aside from the logical indefensibility of such an argument, the most striking thing to me is that, by such a holding, the majority *effectively and subtly abrogate the provision of Rule 101.20W(d) entirely!* For, if the determination of waiver by the court as a matter of law is sufficient to defeat an accused's right to present the evidence anew to the jury, then that right can logically exist in no case. The "safeguard" afforded by section (d) of Rule 101.20W *exists only after the trial court, in the threshold hearing, has found the confession admissible as a matter of law.* In order for the court to make that determination, he must find, as a matter of law, that the accused *waived* his right to silence, and, unless he was permitted counsel before he confessed, that he *waived* his right to the assistance of counsel. Therefore, the finding of waiver, as a matter of law, must be made in every case before the court can admit the confession (before the jury can consider the confession), and before the "safeguard" provided by Rule 101.20W (d) comes into play. If the finding of waiver as a matter of law extinguishes an accused's right to the latter safeguard, it simply did not exist from the beginning.

Finally, the majority holds that "reasonable minds could not differ in concluding that the *weight and credibility* of

Aiken's confessions were not affected by the alleged earlier denial of his *procedural safeguards*."[10] (Italics mine.) I cannot conceive of an appellate court constituting itself a *fact-finding tribunal*, competent to assess the *weight and credibility* a trial jury would, or could, afford relevant evidence.

Furthermore, the failure to present proof to the jury of the fact of Aiken's request for counsel cannot be charged to this appellant. The evidence simply was not available to him. It could have been made available if, at the time Aiken's attorneys originally requested an opportunity to audition the tape recording (exhibit 11) under favorable conditions, their request had been granted.

I do not dispute the majority's conclusion that the actions of the trial court did not constitute an abuse of discretion. But while we need not assess fault, we must recognize the fact that adequate opportunity to audition this tape was not afforded Aiken's counsel, and, therefore, any failure in this regard cannot warrant a denial of appellant Aiken's right to present this vital fact to the jury.

### APPELLANT WHEAT

I shall discuss several reasons for my belief that the conviction of appellant Wheat was obtained through violation of his constitutional rights, and hence that he, too, must be granted a new trial.

Again, the central issue is whether there was a voluntary, *knowing, and intelligent* waiver by appellant of his constitutionally guaranteed right to the assistance of counsel.

Since the majority opinion gives scant attention to the relevant factors surrounding appellant Wheat's interrogation regarding the singularly damning confession of the slaying of James Harp, a more adequate statement of the facts is necessitated here.

---

[10]This euphemism refers to appellant Aiken's right to counsel, characterized by the United States Supreme Court as *"too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."* (Italics mine.) *Glasser v. United States,* 315 U.S. 60, 76, 86 L. Ed. 680, 62 Sup. Ct. 457 (1942).

On Sunday, April 25, 1965, at 7 p.m.,[11] appellant Wheat was brought before Judge Hoar, Seattle District Justice Court, where he was advised that he had been charged with the crime of murder in the first degree. A transcript of the proceedings is in the record. It shows that the complaint, signed by the prosecuting attorney, was read to Wheat in open court. It alleged that:

> He, the said Antonio Nathaniel Wheat, in the County of King, State of Washington, on or about the 24th day of April, 1965, while then and there, willfully, unlawfully and feloniously engaged in committing, attempting to commit or in withdrawing from the scene of the commission of a felony, to-wit: Robbery, willfully, unlawfully and feloniously did shoot at, toward and into the body of one James Harp, a human being, with a certain deadly weapon, to-wit: .22 caliber pistol, thereby mortally wounding the said James Harp, from which said mortal wounds the said James Harp then and there died;
> . . . .

The court then "advised" the accused Wheat:

> [Y]ou have a right to preliminary examination and to waive such examination. You have a right to an attorney or counsel *at the preliminary examination* and you are also informed that you have a right to make a statement, not under oath, as to the charge against you, and you are not required to make such a statement and that any statement made by you may be used against you. . . . And you are also informed of your *right to appear and defend this charge in person or by counsel* and that you are entitled to a reasonable time and opportunity to consult with an attorney or counsel, and you are entitled to the right of a trial by jury. (Italics mine.)

Appellant Wheat was then asked if he wished to enter a

---

[11]Appellant Wheat had, prior to that time, and as the result of several successive interrogations, given three statements. The first was an innocuous statement of his activities on April 24, 1965, and contained no reference to the Harp robbery or homicide. In the second and third, however, Wheat implicated himself in the robbery while blaming the shooting on Aiken.

plea to the charge. His significant reply was: *"As this is a murder charge,* I plead *not guilty."*[12] (Italics mine.)

Detective Nault, chief of detectives of the King County Sheriff's Office, testified regarding the detention of appellant Wheat since 3:30 p.m. on April 24. He also testified that he had contacted Deputy Prosecutor Kinzel by telephone at about 2 p.m. on April 25th. Mr. Kinzel testified that he had received the telephone call from Detective Nault at about 2 p.m. and had immediately thereafter attempted to contact Prosecutor Carroll by telephone. Mr. Carroll testified that he had received a telephone call from Mr. Kinzel while at his summer home on Bainbridge Island, and that he had advised Mr. Kinzel to make arrangements to have the defendant brought before a committing magistrate as quickly as possible. Mr. Carroll stated that he took the next boat from Bainbridge Island, arriving in Seattle at about 4 p.m., and he thereafter made arrangements to have his secretary type up the complaint and warrant. He then called Judge Hoar at his home and asked him to come to his courtroom. He stated that he also had asked Mr. Kinzel to contact Louise Sator, a court reporter, in order that she might record the proceedings.

The brief hearing (which lasted 10 minutes) was terminated at 7:15 p.m. with a statement by the deputy prosecutor and the court:

> I have nothing further, your honor, and this matter is continued to *9:30 tomorrow morning for the possible appointment of counsel?* The Court: Yes. (Italics mine.)

But this attempt to protect appellant Wheat's rights was, by the subsequent actions of the interrogating officers, made little more than an elaborate charade and frustrated the prosecutor's attempt to have counsel appointed for Wheat at an early stage of accusatory proceedings.

At about 10 p.m., two detectives of the Seattle Police Department began an interrogation of appellant Wheat in

---

[12]It is difficult to conclude, in the face of this simple, eloquent expression, that appellant Wheat understood that, by confessing the implication in the Harp robbery, he had also confessed guilt of the homicide. See my discussion regarding appellant Aiken in footnote 3.

the sheriff's office, which interrogation culminated in the statements implicating Wheat in the robberies of Wolf and Fair. Again, appellant Wheat blamed the actual killing of the victims on appellant Aiken.

Then, between 1 and 1:15 a.m., appellant Wheat was taken to the "interview" room, where appellant Aiken was being interrogated, and was asked there to confirm his statement regarding the *Wolf* homicide, which had been shown appellant Aiken earlier in his interrogation.[13] When Wheat confirmed the statement, and said that he did not wish to change it, appellant Aiken told him it was a "damn lie," and, having exhausted his attempts to evade the demands of the interrogating officers, gave his first statement to the police, orally, in the presence of Wheat. The statement accused Wheat of the killing of Wolf.[14]

Appellant Wheat was then taken to another room, where Detectives Mullen and Church and Sergeant Crider commenced an interrogation of Wheat (lasting until 2:45 a.m.) regarding the *Harp* slaying, *the crime with which Wheat had been charged at the proceedings in justice court only a*

---

[13]Interestingly enough, while it is stated by both the majority opinion and the trial court that it was the "confrontation" with Wheat that "caused" Aiken to confess, no mention is made of the fact that Wheat was also involved in the confrontation, and was accused by Aiken of having been the triggerman. The confrontation cannot conceivably be held to have been at the request of appellant Wheat.

This very factor was given significant weight by the United States Supreme Court in *Escobedo v. Illinois, supra,* the court there stating, in footnote 5, that: "Although there is testimony in the record that petitioner and his lawyer had previously discussed what petitioner should do in the event of interrogation, there is no evidence that they discussed what petitioner should, or could, do in the face of a false accusation that he had fired the fatal bullets."

It seems strange that the majority can find this situation so compelling as to induce a confession by one, and yet be so innocuous in the case of the other.

[14]The trial court and the majority opinion here again engage in illogical analysis and conclude that appellant Wheat gave this "correcting" statement only "after laboring with his conscience for 'putting the finger' on Aiken as the one who had fired the shots," a conclusion which seems to me wholly out of place when applied to one who is, throughout, pictured as a callous killer!

*few hours before.* This interrogation resulted in a confession by appellant Wheat in which, for the first time, he admitted that he, and not Aiken, had fired the fatal shots.

The majority recognizes and approves the rule that any secret interrogation of an accused following the commencement of formal proceedings against him, without the presence of counsel, contravenes the guarantees of federal due process, *State v. Moore,* 61 Wn.2d 165, 377 P.2d 456 (1963); *People v. Waterman,* 9 N.Y.2d 561, 175 N.E.2d 445 (1961); *Massiah v. United States,* 377 U.S. 201, 12 L. Ed. 2d 246, 84 Sup. Ct. 1199 (1964); *McLeod v. Ohio,* 378 U.S. 582, 12 L. Ed. 2d 1037, 84 Sup. Ct. 1922 (1964); 381 U.S. 356, 14 L. Ed. 2d 682, 85 Sup. Ct. 1556 (1965), but then proceeds to deprive the rule of any force and effect by ignoring applicable state law.

I, of course, recognize that the right to counsel may be waived by the accused, if done *knowingly and intelligently.* But, by some obscure alchemy, the majority opinion attempts to transform the warnings of the privilege against self-incrimination and the right to the assistance of counsel into a waiver of those rights by the accused, and holds that the interrogation of appellant Wheat regarding the crime with which he had just been formally charged, was proper notwithstanding the rule referred to above.

I cannot agree with either the rationale or the result of this holding.

First, this court, in *In re Wilken v. Squier,* 50 Wn.2d 58, 309 P.2d 746 (1957), set forth the advice that must be given an accused at his arraignment, stating, at 61:

> The right of an accused to appear and defend by counsel is expressly guaranteed by Art. I, § 22 (amendment 10) of the state constitution. In furtherance of this constitutional guarantee, RCW 10.01.110 and 10.40.030 imposes upon the court three duties: (1) to inform the defendant that it is his right to have counsel before being arraigned; (2) to ascertain whether because of the defendant's poverty he is unable to employ counsel, in which event, the *court must inform the defendant that the court shall appoint counsel for the defendant at*

*public expense if he so desires;* (3) to ask whether the defendant desires the aid of counsel. (Italics mine.)

This court concluded that the statute imposed a duty on the court to fully inform the defendant regarding this right to court-appointed counsel, and, *without this information or prior knowledge of the right, a defendant could not waive the right "intelligently and competently."* See, also, *In re Friedbauer v. State,* 51 Wn.2d 92, 316 P.2d 117 (1957); *State v. Dechmann,* 51 Wn.2d 256, 317 P.2d 527 (1957); *In re Aichele v. Rhay,* 57 Wn.2d 178, 356 P.2d 326 (1960). In *In re Wakefield v. Rhay,* 57 Wn.2d 168, 356 P.2d 596 (1960), this court held that an express statement by the accused that he did not wish counsel was insufficient, since, lacking this vital knowledge, such waiver could not have been made "knowingly and intelligently."

No prior knowledge of this right has been demonstrated in the case of this inexperienced criminal defendant, and it is patently clear that the "advice" given him in the justice court was legally insufficient under the rule above-referred to.

Therefore, the conclusion of the majority that appellant Wheat had been sufficiently warned of his privilege against self-incrimination and his right to the assistance of counsel, is unwarranted and wholly devoid of support in the record before us. The required advice by the court, once formal proceedings have been commenced against him, includes the advice of the right to counsel at state expense if the accused is without funds with which to hire a lawyer. *This advice was never given appellant Wheat by the officers or by the court.* Under the law existing at the time appellant Wheat was tried, the *officers* were not required to give this advice, but, under the existing state law, such advice was required to be given appellant by the *court.*[15] The advice

---

[15]The United States Supreme Court, in *Miranda v. Arizona, supra,* has placed the responsibility on the interrogating police officers to advise the suspect of his right to court-appointed counsel, stating, at p. 473, that: "In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if

not having been given, appellant Wheat was without the knowledge prerequisite to a "knowing and intelligent" waiver of the right to counsel at the time the officers, in their post-midnight in-custody inquisition, questioned Wheat regarding the crime with which he had just been charged.

The resulting confession having been utilized to obtain appellant Wheat's conviction of murder and sentence of death, he must be given a new trial, absent this forbidden confession. I would reverse and remand.

## SUMMARY

The critical questions presented by these appeals involve the application of the fifth and sixth amendments to the United States Constitution to the facts in the record before us. In our disposition of them, therefore, this court is bound by the interpretations given these amendments by the United States Supreme Court.

In recent years, we have witnessed an increasing concern on the part of that court for the individual, reflected in a series of decisions which have applied more and more of the protection of the so-called Bill of Rights to the states.

On June 19, 1961, the United States Supreme Court held

---

he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it." (Footnotes omitted.)

This language bears a remarkable resemblance to the expression of this court in *In re Wilken v. Squier, supra* at 62, in which it was pointed out that "Merely asking the defendant whether he wants a lawyer does not convey the information that he is entitled to a lawyer at public expense if he is an indigent person . . . . *Thus, an indigent defendant's waiver may be made under the mistaken impression that, since he cannot afford to pay a lawyer, he cannot have legal representation.* (Italics mine.)

that the Fourth Amendment's right of privacy was enforceable against the states through the Fourteenth. *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 Sup. Ct. 1684, 84 A.L.R.2d 933.

On March 18, 1963, that court held that the right to counsel guaranteed by the Sixth Amendment was applicable to the states through the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799, 83 Sup. Ct. 792. That right has subsequently been applied to the period following the formal commencement of criminal proceedings, *Massiah v. United States, supra; McLeod v. Ohio, supra*, to the "accusatory" stage, *Escobedo v. Illinois, supra*, and to the "line-up," *United States v. Wade*, 388 U.S. 218. 18 L. Ed. 2d 1149, 87 Sup. Ct. 1926 (1967), and *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178, 87 Sup. Ct. 1951 (1967).

On June 15, 1964, the Supreme Court held the Fifth Amendment's exemption from compulsory self-incrimination was also protected by the Fourteenth Amendment against abridgment by the states. *Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653, 84 Sup. Ct. 1489 (1964).

On April 5, 1965, the Sixth Amendment right of confrontation was applied by the Supreme Court to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 13 L. Ed. 2d 923, 85 Sup. Ct. 1065 (1965).

These rights, deemed so fundamental as to be required by due process, have been amplified by subsequent decisions of the United States Supreme Court referred to herein. The decisions referred to are binding on this court,[16] and, in my opinion, compel the granting of a new trial in these cases before us.

The trial of these cases at bar took place in September and October, 1965, prior to the date of *Miranda v. Arizona, supra*.

---

[16]Canon 3 of the Canons of Judicial Ethics provides that: "It is the duty of all judges in the United States to support the federal Constitution and that of the state whose laws they administer; in so doing, they should fearlessly observe and apply fundamental limitations and guarantees.

[T]he requirements of which, therefore, are not directly applicable, *Johnson v. New Jersey,* 384 U.S. 719 (1966), although relevant on the issue of voluntariness, *Davis v. North Carolina,* 384 U.S. 737 (1966). *Clewis v. Texas,* 386 U.S. 707, 18 L. Ed.2d 423, 87 Sup. Ct. 1338 (1967).

The principles enunciated in *Escobedo v. Illinois, supra,* however, are directly applicable.

Under the foregoing decisions, the oral and written statements of appellant Aiken, and the final statement by appellant Wheat relating to the Harp homicide, all of which were given in response to impermissible police custodial interrogations, were inadmissible against these appellants at their trial. Their use in obtaining these convictions requires reversal of the respective convictions and sentences of death, and the granting of a new trial.

The statement of appellant Wheat was given after the time his right to counsel arose under the controlling cases of *Escobedo v. Illinois, supra,* and *Massiah v. United States, supra,* following his arraignment on the Harp homicide, and with the purpose of securing a further admission of guilt from appellant Wheat regarding that same homicide. This interrogation began about 1:15 a.m. and lasted until nearly 3 a.m., although it was known that Wheat was to be furnished counsel at 9:30 that morning, and the statements were obtained in an attempt (which proved successful) to gain sufficient inculpatory admissions to assure his conviction and the imposition of the death sentence before he could receive the advice of counsel. The officers won the race with the clock and, by the time his counsel was appointed, the principal purpose of having counsel had been frustrated.

As the United States Supreme Court noted in *Escobedo, supra* at 487:

> In *Gideon v. Wainwright,* 372 U.S. 335, we held that every person accused of a crime, whether state or federal, is entitled to a lawyer at trial. The rule sought by the State here, however, would make the trial no more than an appeal from the interrogation; and the "right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is

already assured by pretrial examination." *In re Groban,* 352 U.S. 330, 344 (Black, J., dissenting). "One can imagine a cynical prosecutor saying: 'Let them have the most illustrious counsel, now. They can't escape the noose. There is nothing that counsel can do for them at the trial.'" *Ex parte Sullivan,* 107 F. Supp. 514, 517-518.

Although appellant Wheat was advised by his interrogators in each instance that he had a right to consult an attorney,[17] he failed to demand the assistance of counsel. But, under the circumstances, since appellant Wheat lacked the knowledge essential to a "knowing and intelligent" waiver of his right, to hold that his mere failure to request the assistance of counsel constituted waiver would, in truth, make him the "deluded instrument of his own conviction," and of the jury's imposition of the death penalty.

Appellant Aiken was arrested near Blaine, Washington, at about 4 o'clock on a Sunday afternoon. His interrogation, after his return to Seattle, continued throughout the early hours of Monday morning. So intent were the officers in securing his admissions regarding the three homicides (with which he was ultimately charged) before he could procure counsel, that they did not permit him to be taken before a magistrate until 11:30 Monday morning (long after that court had opened). They detained him just long enough to get his signature on the last of his unwittingly incriminating statements before counsel could be appointed for him.

Aiken's interrogation was intense, as is apparent from the tape recording of his first interrogation. Though it is revealing, disclosing several statements which I can only

---

[17]It is also noted that each of the statements of these appellants contained a declaration that they had been advised of, and understood their rights, and that the statements were voluntary. But the Supreme Court, in *Miranda v. Arizona, supra* at 492, has noted that: "The mere fact that he signed a statement which contained a typed-in clause stating that he had 'full knowledge' of his 'legal rights' does not approach the knowing and intelligent waiver required to relinquish constitutional rights. Cf. *Haynes v. Washington,* 373 U.S. 503, 512-513 (1963); *Haley v. Ohio,* 332 U.S. 596, 601 (1948) (opinion of MR. JUSTICE DOUGLAS)."

consider threatening in every sense of the word, the type-written transcript of portions of the interrogation fails to convey the coercive atmosphere in which Aiken's questioning took place. See appendix to this dissenting opinion.

But most important of all, the vital part of his interrogation took place after he had expressly stated his desire to consult counsel, and his requests went unheeded by his interrogators. No argument advanced by the state or by the majority opinion can overcome this important factor. The coerciveness of the interrogation thereafter, with its importunities and threats, was heightened by the fact that Aiken knew he was alone and would have to remain alone in his predicament. No assistance would be allowed him. And there would be no surcease until he "cooperated."

This tactic has been forbidden by the above-cited applicable decisions of the United States Supreme Court. The resulting confessions were unconstitutionally obtained and unconstitutionally admitted in evidence against appellant. The jury considered them in reaching their verdict, and, in view of the nature of the statements, they may have been crucial in the imposition of the death penalty by the jury. Aiken's conviction cannot stand on such a basis.

The Supreme Court noted, in *Haynes v. Washington*, 373 U.S. 503, 518, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963):

As we said in *Rogers v. Richmond*, 365 U.S. 534, 541:

> "Indeed, in many of the cases in which the command of the Due Process Clause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed. Despite such verification, confessions were found to be the product of constitutionally impermissible methods in their inducement."

Of course, we neither express nor suggest a view with regard to the ultimate guilt or innocence of the petitioner here; *that is for a jury to decide on a new trial free of constitutional infirmity,* . . . . (Italics mine.)

The same reasoning should apply in the cases before us. I would reverse the convictions and remand each of them to the superior court for a new trial, to be conducted in a

manner consistent with the requirements set forth by the United States Supreme Court.

WEAVER and HAMILTON, JJ., and BARNETT, J. Pro Tem., concur with DONWORTH, J.

### APPENDIX TO DISSENTING OPINION

The following is the transcript of the tape-recorded portion of the interrogation of defendant Aiken as prepared by the court reporter at the direction of the trial judge. Portions of the tape that were unintelligible to the reporter are indicated by asterisks. This tape recording was played only once in the courtroom in the presence of appellants and their counsel at the original 101.20W hearing. It was not played in the presence of the jury due to the fact that neither the court nor counsel was aware that Exhibit 11 contained Aiken's repeated requests for the assistance of counsel. Cross-examination of the interrogating officers regarding certain portions of the interrogation is included in footnotes.

---

TRANSCRIPTION OF POLICE INTERROGATION TAPE #1, PURPORTING TO BE RECORDING OF INTERVIEW BETWEEN SEATTLE POLICE DEPARTMENT DETECTIVES AND DEFENDANT ARTHUR NATHANIEL AIKEN.

#### TAPE No. 1

Voice: * * * told you that we had some witnesses. Now we will lay it out for you, tell you just exactly what we do know, and * * * we will explain this to you in detail. You make up your own mind if you want to give us a statement, or if you want to tell us about it. That is up to you.

We have another suspect in custody. The other suspect has been most cooperative. The other suspect has defined in great detail how this thing took place, what time, the location, and who were involved. He maintains that you were one of the parties with him, and he is trying to shoot it back to you.

That's right. He is putting the finger on you. He is trying to help himself.

Now we have statements, confessions, from Antonio Wheat. He is presently in the King County Jail, in custody. He has gone into great detail. If you want to tell us about it, fine. It is up to you.

A. * * * The other night on the way in * * * Q. We know what he said. We have it all in black and white. He puts the whole thing in your hands. * * * That is one thing we don't do, is lie. We have no reason to lie. We would defeat our own purpose by lying. You can rest assured we are not. A. * * * Q. You were out of the car. You were in the gas station. A. * * * Q. Tell me, first * * * he walked over to the gas station, he got the key. He went into the rest room. He came back and he jumped back in the car, and you were about half asleep, and you got out of the car. You went and got the rest room key. When you came back from the rest room, you took the guy. A. Me? Q. Yes. Nobody else. Nobody else.

Now do you think that we are still guessing? We got it all, right down the line. Now, do you want to tell us about it?

You asked the attendant for change for a $20 bill. A. I haven't got a $20 bill. Q. You asked him for it. When he opened the cash box, you said that you would take it all.

Now, we are not guessing any more, and we are not playing any games. You want to help yourself, fine. It is up to you.

The only way you can help yourself is by cooperating.[18] A. I don't know what would help myself * * * Q. What do you

---

[18]On cross examination, Detective Chase testified as follows:

"Q. Referring to page 2, line 30, who is asking that question? A. I believe that Detective Mullen asked the question, but I can't be positive. Q. And the line I am referring to reads, 'The only way you can help yourself is by cooperating.' A. Yes. Q. What did you people mean by 'cooperate', giving a statement? A. Well, I don't recall exactly who asked the question, Counsel. Q. Well, my question now is, what did you people mean by 'cooperating'? A. Well, had I said this I would have assumed that the defendant would have been aware that what we meant by cooperation was the fact that he would like to get the investigation completely cleaned up. Q. And when you said, when it was told him that the only way he could help himself is by cooperating, you wanted him to give a statement regarding these things; isn't that correct? A. Well, we wanted to know what his implication or involvement was in the crimes, yes. Q. You wanted him to tell you about them? A. Yes. Q. And Mr. Aiken did tell you about it? A. Yes. Q. Can you suggest to us now how he managed to help himself by doing that? A. I don't know how he has managed to help himself. Q. Well, he hasn't helped himself at all, has he?"

On cross examination, Detective Mullen testified:

"Q. Would you just for the moment turn to page 2 of the transcript? A. 2? Q. Line 30. Calling your attention to line 30. A. Yes, Counsel. Q. Did you detect on the tape that that was your voice that said, 'The only way you can help yourself is by cooperating'? A. I do not believe that I made the statement, Counsel. Q. Well, you will concede that somebody made it? A. If it is here and it is on the tape, somebody had to make it, Counsel, yes. Q. Do you know what they meant by 'cooperating'? A. No, I do not, Counsel. Q. Well, if you said it did you mean that you make a statement? Mr. Kinzel: We will object to that. He said that he didn't say the statement. The Court: Well, he may answer if he understands. A. I cannot answer, Counsel, because I don't believe that I made that statement. Q. (By Mr. Egger) Detective Mullen, are you telling us that you do not know what it means to say 'cooperate'? A. Yes, Counsel. Q. You do know what it means? A. Yes. What does it mean? A. It all depends upon what your interpretation would want it to mean, Counsel. Q. Well, you are interrogating somebody about, I believe, one count of murder and you are saying, now, 'You cooperate,'. What does it mean to you when you say 'you cooperate'? A. You would like them to be truthful, entirely truthful. Q. Tell the truth? A. That is right. Q. Give a statement? A. That is correct. Q. All right. Now, he did cooperate, didn't he? A. May I clarify this, Counsel, please, at this time? The Court: Yes, go ahead and answer it any way you wish. A. At this particular point in our investigation, we did not think that he was; at this particular point in our investigation, to the best of our knowledge, what information we

mean, you don't know what would help yourself? Just the truth. You better get it off your chest. You better get all of it off your chest. A. * * * I remember going to the * * * and that's the truth. Q. You just got done saying you were sleeping in the car. A. That's right. Q. At the station. How do you know * * * that's exactly what you said. A. * * * Q. Are you under a doctor's care at the present time? A. No. Q. Do you have all your faculties? A. I believe so. Q. All right. You are not stupid, are you? A. I don't think so. Q. All right. Don't insult our intelligence. Please don't. Don't sell us short on this at all. A. I'm not trying to sell either one of you short. Q. Don't place us short. We are laying it all out for you right now, right down the line. You want to give us a statement as to exactly what your activities were in this armed robbery, exactly what they were, you think about it. Exactly what you did. You are going to feel much better when you get it off your chest, whether you realize it or not. You've got a family, you've got a mother, father; you've got sisters and brothers. I A. * * * Q. It takes a pretty big man to admit something. A pretty big man. Wheat is not gaining anything by what he's telling us. He's being a man about it. He's admitted it. He's implicated himself by admitting * * * * * A. * * * * * because I don't know what happened. Q. You don't know what happened? What kind of a gun do you own besides the .25? A. * * * Q. That's right. Let me point something up here at once. All the answers we have got already. All the answers we have got. Any questions we ask you, we know the answers to already. The only reason we ask you these questions is to see what your answer will be, in this way will be determined whether you are lying to us.

Now, we didn't just go up there and have you picked up for nothing * * * remember this now: we are being absolutely honest with you. We will never lie to you at any time, and don't you lie to us. Don't make that mistake.

You are sitting in the driver's seat right now. If you want to drive, drive. If you just want to take a ride, why you can ride. But I will tell you something: if you think that your guts are a little churned now, a little tight, you try keeping it inside for awhile longer. * * * Don't you under-estimate our ability or our intelligence. We are not sitting here under-estimating yours. A. * * * Q. You are when you tell us that you don't know anything. * * * Please, don't * * * A. * * * I don't know myself. Q. Yes, you do. I asked you if you had another gun besides that .25 automatic. Answer that question. A. Not at present. Q. What do you mean, "not at present"? A. * * * Q. What kind did you have before? A. I had a .22. Q. * * * A. * * * Q. .22 what? What did it look like? What did the gun look like? A. * * * Q. What color was it? What color was the handle? A. * * * Q. Was the handle chipped? What happened to the gun? A. Stolen. Q. When? A. * * * Q. * * * I am going to stop you right now. Don't make the mistake of continuing to lie. Now, we have been pretty fair with you. Now, no . . . at all. We have been fair. You stop and take that into consideration. Just take that

had, Mr. Aiken was implicated in the Harp homicide, and this is what —and this is what it was in reference to. We had reason to believe that he was implicated in the Harp homicide. Certainly thereafter we found out that in this particular phase he was telling us the truth, and Wheat certainly thereafter revealed that he, and he alone, committed the Harp homicide, and at this particular point we were not aware of this. Q. Well, do you know how Mr. Aiken could help himself by cooperating? A. Peace of mind, Counsel."

into consideration. No half-truths, please. You are going to have to get it off your chest. There is no question about it. You are going to have to get it all off your chest. O.K.

We have got Wheat. We have got the statements. We have got everything we need. Now, you make up your own mind whether you want to be cooperative or you want to be uncooperative. The thing that cooperation does is help you. It doesn't help us. We're giving you the benefit of the doubt, as far as your cooperation.[19] A. * * * Q. We told you that we know what is going on. A. * * * Q. This what? A. * * * Q. You were not surprised. You were right there. You were right there. It shouldn't be surprising to you at all. It shouldn't be strange or surprising. It should be very, very vivid in your mind, exactly what happened; what took place. * * * One other statement. Three of you went to the * * * together; three of you. A. Who? Q. The three of you. You know. You were there. You were with him in the gas station. * * * He thinks you are talking about Brown, too. No, we have got this all ironed out. Brown was home at 1:30. You want facts. A. * * * Q. All right. All right. You and Antonio and the victim went into the restroom together. Antonio went first. When he first pulled in to the gas station. To the rest room. He went in and told the attendant he wanted the key to the rest room; went into the restroom; came back; talked to a couple of people; went back to the car. Two kids came in, in a car, but they left again. When they left you got out of the car, you went in the gas station, both of you got out of the car, you went in the office, Antonio stood outside in the front. * * * attendant. The three of you walked out to the * * * you asked the attendant for change for a $20 bill. The attendant opened the cash box. You said, "I will take it all." After you got the money, the three of you * * * rest room. You gave the attendant the key to the rest room * * * the attendant said, "What are you going to do?" The three of you went into the rest room. Now do you think we are guessing? A. * * * Q. Do you know what ballistics are, Art? Do you know what "ballistics" means? This is when they run a comparison test on a shell that's been—or a gun that's been fired. If I were to shoot you and later on they were to pick up the gun * * * blood * * * they could positively identify it as coming from that gun. No two guns fire the

---

[19]On Cross examination, Detective Chase testified:

"Q. Would you refer to page 5, lines 18 through 31. Who was doing the talking there? A. Line 18, Detective Mullen I believe was doing the talking. Q. Referring down to line 26: 'We have got everything we need. Now, you make up your own mind whether you want to be cooperative or you want to be uncooperative. The thing that cooperation does is help you.' Now, again the cooperation you are talking about is him giving a statement, isn't it? A. We were interested in his story as to what happened, yes. Q. He was told cooperation would help him, correct? A. The statement was made 'The thing that cooperation does is help you. It doesn't help us.' Q. And he cooperated with you? A. Yes. Q. Once again, could you suggest to us how he managed to help himself by cooperating? A. I don't know. Q. Did you have any idea at that time how he could help himself by cooperating? A. Maybe for his own peace of mind, that is all. Q. Do you believe that there is an implied promise in that statement if he does cooperate it is going to be of some assistance to him? A. There wasn't anything meant to be a promise, no implied promise in that statement."

same. It is like a fingerprint—no two are the same. They can positively identify which weapon the projectile came from. You understand that? All right. You want to tell us about it? We are not fishing, we are telling. We have got much, much more. A. * * * Q. No, no, no. This isn't the gun. It is not the gun at all. Not the one that we took off you. * * * silver .22 automatic, made in Spain. * * * You are going to feel better when you tell us about it, * * * A. * * * Q. You can't? A. * * * Q. * * * A. Either one. Q. You want to read the statements? A. * * * Q. * * * You can read them yourself. Have you read them? I want you to tell us exactly what happened. All right? A. * * * Q. * * * As far as your case is concerned. I don't feel should be shown that particular statement.

All right. Now, when we are talking to you about this particular thing, we are not talking about one job, we are talking about that many.

I will show you a statement on one of those jobs, not the one we are talking about, to show you we are not lying about any of this. We know exactly what went on in all of them, and we know what went on, because we have got the physical evidence to back it up. And this is corroborated by Wheat's statements. You are implicated in every single job. Don't under-estimate us. We have got other proof of the fact that the weapon is your gun. Not from one person, but from at least four.

Now, this is from one job, not the one we are talking about. You can't read it or understand it, I will read it to you. Can you make it out all right? A. Yes. Q. All right. Want to sit down? A. * * * Q. You tell us the truth then if this is a lie.[20] A. * * * Q. This matches all the physical evidence. The guy is not lying. A. He is lying. Q. We have got the physical evidence at the scene. A. He is lying. Q. What is he lying about. Tell us what he is lying about.[21] A. * * * Q. What is he lying about? A. He is lying. Q. Where? Show us where he is lying in here. One place. One place that he is lying. Just one place. Just one place that he is lying. A. * * * Q. You don't cooperate with us, you will be charged on every single count. This isn't a threat or anything like this. It's a promise.[22] We are not * * * we are not mad at you * * *

---

[20] and [21]The reporter's transcript indicates that the response of defendant Aiken is unintelligible at these points. However, as stated in the foregoing opinion, it is at these points that defendant Aiken's requests for counsel can be heard on the tape.

[22]On cross examination, Detective Chase testified:

"Q. All right. Now, referring to line 8, who is asking that particular question? A. Detective Mullen. Q. And the question is, 'You don't cooperate with us, you will be charged on every single count. This isn't a threat or anything like this. It is a promise.' Don't you consider that a threat of a kind? Mr. Kinzel: I will object to that. The Court: He may answer. A. I wouldn't consider it a threat due to the situation. There was no threat meant by that question. Q. No threat meant by saying 'If you don't cooperate with us, you will be charged on every single count.'? A. No. Q. I see. Mr. Chase, what is the implied promise there if he does cooperate? A. I don't see any promise. Q. Isn't it implied that if he does cooperate he won't be charged on every single count? A. I don't understand it that way. Q. You didn't intend for Mr. Aiken to understand it that way either? A. I didn't tell Mr. Aiken what it was. Q. As a matter of fact, were you or Mr. Mullen in any

all we are concerned about is the truth * * * we are showing you our hand. This is a * * * you can't beat it. A. Counterfeit Q. You think this is counterfeit, this statement? It is no counterfeit. A. * * * Q. It can't be. It matches everything; everything at the scene. It identifies photographs and everything, step by step. Do you know how tall you are? We know how tall you are. You are five foot three inches. Do you have any idea how easily, scientifically we can tell how tall the subject was * * * that shot * * * in the head. A. * * * I didn't do it. Q. It is your gun. You had the gun at the time. It couldn't have been him. He is over six feet tall. A. * * * Q. You didn't do it? A. I didn't do it. Q. All the witnesses place you with him * * * Arthur Aiken. Would you show Arthur where he is mistaken? He says it is counterfeit. He don't know anything about it. A. Here's the whole thing. Wheat * * * Q. Now, you haven't had a chance to give your side of it. Maybe you were just along and Wheat did the killing. We don't know this. Everything right now is pointing it right on you, and these are very serious charges, homicide and murder. If Wheat is lying about the statements, that you didn't kill him, if Wheat killed him, we want to know it. * * * statements to that effect * * * along with these statements, but we certainly want to

position at all to say what if any count he would be charged on, cooperate or no cooperation? A. No, not at that— Q. The matter of charging is entirely up to the Prosecuting Attorney, isn't it? A. That's correct. Q. Why was the question of whether or not Mr. Aiken would or would not be charged brought up to him by you people then? A. Well, I don't know why Detective Mullen asked him that particular question. I didn't ask it."

Detective Mullen, on cross examination, testified:

"Q. . . . Now, isn't it true that the words that show here say, 'You do not cooperate with us, you will be charged on every single count. This isn't a threat or anything like this. It's a promise'? A. Yes, Counsel. Q. Did you say that? A. I listened to the tape and it sounds like my voice, and I believe I did say this, Counsel. Q. Did you meant that? A. It was a statement that was made yes. Q. You did mean it? A. I believed that the defendant would be charged on every single count, yes. Q. If he didn't cooperate with you? A. I did not say 'if', I do not believe, Counsel. Q. Isn't it true that before what is said here, it shows on this transcript, as you heard the tape a while ago, this tape clearly indicated that you said, 'Tell you what, if you don't cooperate with us, you will be charged on every single count.'? A. If this is what is on the tape, Counsel, and if I said that, then this is what I said. Q. And you now concede that you meant what you said? A. I assumed that he would be charged on every single count. It was not made as a threat. A. Well, it was put in such a way that if he didn't cooperate you would, and if he did you wouldn't, isn't that true? Mr. Kinzel. I object. That is argumentative. The Court: Let him answer. A. Repeat the question, Counsel, please. Q. (By Mr. Egger) Isn't it true that the way it was put to him was that if he didn't cooperate you would charge him with all three counts, but if he did you wouldn't? A. No, counsel. This is why I made the statement, as I believe it, as I termed it, that it wasn't meant as a threat."

listen to your side * * * charging with murder * * * not until you have a chance to tell us. A. Well * * * Q. We discussed Wheat's * * * A. * * * Q. There are two sides to every story, Art. We can't pretend to read your mind. * * * A. * * * Q. You didn't do this * * * A. * * * You ask me to verify the statement * * * Q. Sure * * * ask whether if he review this statement * * * we are not going to lie to you. This is too serious. We don't expect you to lie to us either. * * * A. I know * * * Q. This is what we are asking. We are asking you to give a true story. How long have you known Wheat? A. Oh, not * * * Q. How long? A. * * * Q. Where do you come from? A. Washington, D.C. Q. * * * Bought your automatic, Seattle Sporting Goods store? A. * * * Q. * * * Box it came from * * * it is not that this is burglary or larceny or auto theft * * * this is more than * * * we want to make a fair decision on this * * * stop the car * * * they ask who was in the car. A. * * * identification. Q. Have you heard any news broadcasts, or read in any newspapers concerning * * * A. * * * Q. * * * A. * * * Q. Where? A. * * * Q. Oh? Did you see your girl friend * * * A. * * * Q. * * * Do you have a girl friend in Seattle? A. * * * Q. Hunh? A. Don't know anyone in Seattle. Q. You know Wheat's girl friend? A. I met her. * * * Q. * * * How do you like Seattle? A. * * * Q. Not the big city that Chicago is? A. * * * Q. What? A. * * * Q. How about Washington, D.C.? Is that a pretty good town? A. * * * Q. They treat you any better here than they do in Chicago, as far as the race problem? A. I've never been in Chicago. Q. I mean Washington, D.C. * * * Yeah, come in. Yes. * * * A. * * * Q. Sit over here, Art. * * * A. Did you say * * * Q. * * * A. * * * You say these things? Q. * * * A. You know it's a dam lie. Q. * * * I had a * * * but I didn't use it * * * (At this point, tape became completely unintelligible) Q. So you know what you are doing. * * * A. I say I don't give a dam, who brought up the subject —he did—I will pull the gun out. Q. Excuse me, are you talking about * * * A. * * * Q. You are talking about this one here? A. And the guys went down * * * so went back home. Q. Who went back home? A. * * * with him, all three went back. So he told me, and I told him no, I had, and I * * * Q. Who fired the shots? A. He did. Q. Who? A. Tony. Q. What is his name? A. Tony Wheat. Q. Did you ever read the name of the attendant in the paper later on? A. No. Q. Where was the station at? A. All I know is on Empire Way somewhere. Q. What was the name of the station? A. I believe it was * * * Q. How much money did you get * * * A. * * * Q. What happened there? Were you standing there * * * What did the man say? * * * A * * * Q. Did you hit the man with your hand? A. * * * Q. Who did? A. As far as I know, didn't * * * Q. How was the man dressed? A. I paid no attention, other than the fact that he had on a service station uniform. * * * Q. Was he an old man or a young boy? A. He was * * * Q. In age, how old was he? A. I don't know. Looked like 20 something. Q. Was he * * * A. I thought he was a * * * man with * * * Q. Do you remember what he said before Antonio shot him? A. Well * * * Q. Just before he started praying, do you remember what you told him? A. He was saying something about being religious or something—Q. What else did he say? A. * * * Paid no attention to him. Q. Antonio, do you agree with that? A. * * * Q. I was just wondering now if you want to change your statement, or if you wanted to stick with your statement. Is that all you wanted to ask him now? A. That's all. Q. * * * O.K. Sit over here. To

give you a chance to give your side * * * Now, do you want to give the Sgt. here a statement * * * Now. A. * * * Q. * * * A. * * * Q. * * * Your middle name? A. Nathaniel. Q. Last. A. N-a-t-h-a-n * * * Q. And your last name? A. Aiken, A-i-k-e-n. Q. How old are you? * * *

December 12, 19, 1967. Petitions for rehearing denied.

